## THE CHEMUNG CANAL BANK *vs.* THE BOARD OF SUPERVISORS OF CHEMUNG COUNTY.

Boards of supervisors cannot bind their counties by an act not within the limits of the express powers conferred upon them by statute. They cannot allow a claim on any notions of their own as to its equity.

They are bound to provide funds to pay orders drawn by the superintendents of the poor and certificates given for service as jurors, and if the funds are wasted or lost, to provide others to replace them.

They cannot make bills of exchange.

County orders paid by the treasurer have lost their vitality, and cannot again become valid securities in the hands of an innocent holder.

But where, without any fraudulent intents, the holder of large county orders exchanged them with the treasurer for smaller ones which he had paid but which had never been allowed in his accounts, the debt represented by the large orders is not extinguished.

Where, however, the holder of county orders lends them to the treasurer and thereby enables him to use them as his vouchers on a settlement, and is afterwards repaid in other orders which have been paid by the treasurer, subsequent to the settlement, he is estopped from denying the payment of the orders lent, and cannot recover upon those returned to him.

MOTION to set aside report of referees. The plaintiff brought an action of assumpsit against the defendants. The declaration contained the ordinary money counts, and appended to it was a notice that under them a *bill of exchange* of which the following is a copy would be given in evidence :

"No. 189. To the treasurer of the county of Chemung. Pay to the Chemung Canal Bank, or bearer, twenty-eight hundred and thirty-six dollars ninety cents, one year from date, with interest from the first day of February next, being for the full

amount of orders on the late treasurer of the county, taken up by the bank. (Orders now destroyed.)

$2836,90.                    E. C. Frost,

Dated Elmira, Nov. 23, 1843.     D. D. McDowell,

H. White,

Henry M. Graves,

Abraham Primum,

Solomon L. Smith,

I. N. Bennett,

S. Sexton,

Thomas N. Andrew,

Supervisors."

By an order made in the cause, the plaintiff was limited to the cause of action contained in the draft and in the orders in the body of it mentioned. Upon the trial before the referees, the signatures to the draft were admitted to be genuine, but the giving the same in evidence was objected to, on the following grounds. 1. It was drawn by individuals, and not by the county. 2. The drawers had no power to bind the county by such a draft. 3. It was not evidence under the declaration. 4. The suit should have been brought against the individual drawers. The objections were overruled, the evidence received, and an exception taken. An entry from the book of records of the board of supervisors of Chemung county, made the 23d day of November, 1843, was then put in evidence, of which the following is a copy.

"Resolved by the board of supervisors that they issue an order on the treasury for $2836,90, payable in one year from this date, (November 23, 1843,) with interest from the first day of February then next, being for amount of orders on the treasurer taken up by the Chemung Canal Bank, said orders not having been paid by the treasurer, now presented to the board and by them destroyed; whereupon said order was issued to the Chemung Canal Bank."

The draft in evidence was shown to be the order mentioned in the record, and the signatures, the signatures of tne members of the board of supervisors made at the time the resolution was passed. It was also proved by the plaintiff,

that part of the consideration of the draft was a large number of certificates given by the county clerk to jurors for their ser-vices, amounting in the aggregate to $1081,10, and the balance was made up of orders on the treasurer issued by the superintendents of the poor, all of which were held by the plaintiff and delivered to the defendants, and by them destroyed when the draft was given : that at that time a committee of the board had been investigating the county treasurer's accounts, and found him a defaulter to the amount of $3320,44, a portion of which was for moneys appropriated to the payment of these certificates and orders; and the board had ordered his official bond to be prosecuted : that the plaintiffs' cashier was present at the board, and that an arrangement was made with him to receive the orders held by the plaintiff, and give a draft in lieu of them upon such time as would enable the county to realize the money by tax to pay it; which arrangement was carried into effect by the resolution and draft in question. The defendants admitted due notice of presentment and non-payment, and the plaintiff rested. A motion for nonsuit was then made by the defendants' counsel upon the same grounds which were urged against the admissibility of the draft in evidence, the motion denied, and exception taken.

The defendants' counsel then offered to show in defence that the certificates and orders for which the draft was given had been paid by the treasurer, and subsequently put in circulation by him, and that the draft was given by the supervisors in ignorance of this fact. The plaintiff's counsel objected to this evidence unless the defendant should connect it with evidence of fraud on the part of the plaintiff. The referees decided to hear the testimony provisionally, and determine the question as to its competency before deciding the cause. It was then shown by the defendants that for several years prior to July, 1843, the plaintiff's cashier was the brother of the county treasurer : that he was in the habit of receiving at the bank county orders of all descriptions : that they were kept in a separate bundle endorsed " cash items," and were always counted as cash, their amount fluctuating between 1841 and 1843 from $2500 to over

$5000. Shortly before the meeting of the board of supervisors in 1842, the treasurer came to the bank and told the cashier that he wanted some of the orders to lay before the board. The cashier let him have them to the amount of $800, taking his receipt or check for the amount, which was placed with the other orders in the bundle of "cash items." In the spring following, the treasurer redeemed the receipt or check with *poorhouse orders*, drawn subsequently to the meeting of the board, which he had paid. About the same time the treasurer exchanged with the bank jurors' certificates amounting to about $1200, for a like amount of orders drawn by the board of supervisors which the bank held. The reason alleged by him for wishing the exchange was, that the jurors' certificates were for small sums, and there were a great number of them ; that he would be more apt to lose them by fire than an equal amount in larger orders. Prior to the making the draft a committee of the board of supervisors was informed that the bank had made exchanges of large orders for small ones which had been previously paid by the treasurer ; but the members of the board knew nothing of the bank letting the treasurer have the county orders in the fall of 1842, which were replaced by poor-house orders in the spring following. At the settlement of the treasurer's accounts in November, 1842, he was in arrear to the county $682,42.

The defendant's counsel objected to a recovery on the grounds, 1. That the orders for which the draft was in part given had been paid by the treasurer and were void in the hands of the plaintiff, and furnished no consideration for the draft : 2. That the draft was given in ignorance of many material facts, and was therefore void : 3. That the delivery to the treasurer of the orders in the fall of 1842 was virtually a loan to him, and the orders subsequently delivered to the bank in discharge of the debt, having been paid, were void. The referees reported in favor of the plaintiffs for the amount of the draft and interest.

*N. Hill, Jr.* for the defendants, urged the various objections which had been raised before the referees, and insisted that

Cl emung Canal Bank *v.* The Supervisors of Chemung.

boards of supervisors have no power to draw bills on time with interest, even by way of liquidating a county charge : 2. That their powers are mainly judicial, to audit and allow accounts; the policy of the law being against permitting them to contract debts, as it requires them whenever an account is allowed to provide immediate means for its payment. (1 *R. S.* 366, 7, § 4, *subd.* 4 ; *id.* 385, 6, § 5 ; 2 *id.* 474, 5, §§ 102 *to* 104 ; 6 *Hill,* 463.) 3. At all events the supervisors had no power to draw a bill on time, for the liquidation of the certificates and poor-house orders. These had been issued by officers whose function was to audit the claims for which they were given, and were matters entirely out of the scope of the official duties of the board of supervisors. They were intended to reach the treasury, and the board had no power to stipulate for their destruction. The attempt to liquidate them was a void act, and neither the resolution nor the draft imposed any obligation on the county.

*J. A. Spencer,* for the plaintiff.

WHITTLESEY, J.    The board of supervisors of a county acquire their powers by statute. These are specific and limited in their character, and cannot be transcended. In auditing and allowing accounts they cannot admit a claim against the county upon any notions of their own of its equity. (*People* v. *Lawrence,* 6 *Hill,* 244.) The powers given them are " to examine, settle and allow all accounts chargeable against the county, and to direct the raising of such sums as may be necessary to defray the same." (1 *R. S.* 366, 7, § 4, *subd.* 2.) What are to be deemed county charges is declared 1 *R. S.* 385, § 3. Among them are " the sums necessarily expended in the support of county poor-houses and of indigent persons whose support is chargeable to the county." (*Subd.* 12.) In relation to the support of the county poor, it is made the duty of the superintendents of the poor to present annually to the board of supervisors an estimate of the amount necessary for the support of the county poor for the ensuing year, and the supervisors are to cause such sum as they may deem necessary for that purpose

to be raised and paid to the county treasurer, and to be kept by
him as a separate fund. (1 *R. S.* 626, § 50.) The superin-
tendents of the poor audit all accounts for services relating to
the support of the county paupers, and draw directly on the
treasurer for the amount of the accounts they audit. (*Laws of*
*1832, p.* 43, § 1; 1 *R. S.* 3d *ed. p.* 795, § 62.) In regard to
compensation to jurors, boards of supervisors may direct an al-
lowance to them, in which case they are to raise the necessary
sum for the purpose, and the jurors are paid directly by the
treasurer on the certificate of the clerk of the court of their
attendance. (2 *R. S.* 643, § 37.) In relation to these two
classes of claims, therefore, boards of supervisors have no duty
to perform as auditors. Their only duty is to raise money to
be placed in the treasury, sufficient to meet their probable
amount. The claims held by the plaintiff in November, 1843,
at the time of the adjustment with the defendants, were pre-
cisely of this character. They were orders on the treasurer
given by the superintendents of the poor, and certificates of ser-
vice given to two or three hundred different jurymen, all of
which it was the duty of the treasurer to pay without any fur-
ther auditing or direction. The plaintiff could call upon him
with these evidences of claims against the county, and demand
payment from any moneys in his hands raised for the support
of the poor, or jurymen's compensation, as the case might be,
and in case of his refusal to pay, might maintain an action
against him upon them. (*Ex parte Lynch,* 2 *Hill,* 45.) In
the case before us, the treasurer neglected to pay these claims,
not because the necessary funds were not raised and placed in
his hands for the purpose, but because he had misapplied them
to his own use. The board of supervisors knew the fact, inves-
tigated the matter, ascertained the amount of the defalcation
of the treasurer, and of the claims held by the plaintiff. These
claims were debts against the county, and it was the duty of
the board of supervisors to raise funds to discharge them ; and
this having been done once, and the funds lost by the treas-
urer's defalcation, it was the duty of the board to restore them
by action against the treasurer and his sureties, and that re-

source failing, to cause the necessary funds again to be raised. The ground has not been taken, and probably could not be maintained if taken, that the board having once raised the money and placed it in the hands of the treasurer, it could not be responsible for his failure to pay it over. It seems to have been tacitly conceded that if these claims remained unpaid, provision should have been made by the board for their payment. If this be so, although they are not of the class which the supervisors are to audit, I think it fairly comes within the scope of their powers to recognize their validity, and the liability of the county. There was no necessity of examining, settling, and allowing them : that had been already done by the proper authority, and the plaintiff held the evidences of the allowance. These were conclusive as to the amount, and I cannot perceive that it was transcending the powers limited to the board to collect them together and cancel them, and assume the payment of their amount by resolution in the manner it was done. If I have been so far correct in my views, it was doing no more than the board could have been compelled to do, in substance, by mandamus or suit.

The proper mode by which a board of supervisors renders itself legally liable, is by resolution entered in its minutes. Its clerk is to make entries of all resolutions or decisions on questions concerning the raising or payment of moneys. (1 *R. S.* 367, § 9.) If a resolution of this character was within the powers of the board to adopt, the treasurer was bound to pay the money mentioned in it, upon production of a certified copy. (*People* v. *Lawrence, supra.*) It is understood to be usual, instead of a certified copy of the claim and resolution auditing it to present to the treasurer, for the clerk of the board to draw an order on him for the amount allowed by the resolution. This is, in fact, only certifying the resolution in another and more convenient form. What the clerk of the board usually did in other cases, all the supervisors, as individuals, unite in doing in this case. The order is drawn upon the treasurer, signed by all the supervisors, instead of the single signature of the clerk. This, I apprehend, is mere evidence of what the

supervisors did as a body, and it is to be looked upon in no other light. It cannot be considered a bill of exchange, drawn by the board of supervisors as a corporation. If it is to be looked upon in that light, it certainly does not promise for and is not binding upon the corporation. If it is a bill of exchange, the individuals who drew it are alone liable as drawers, the addition of *supervisors* being mere *descriptio personarum.* (*Barker* v. *Mech. Ins. Co.* 3 *Wend.* 94.) I doubt also, whether a board of supervisors can be parties to a bill of exchange. It would seem that drawing a bill on time, payable with interest, would in effect be borrowing money without authority of law. (*Barker* v. *Loomis,* 6 *Hill,* 463.) This order cannot therefore be regarded as a bill of exchange. It is rather evidence of the resolution which at the time adjusted the claim between the parties to this suit. It is this act of the board of supervisors which is the true foundation of the action in this case. The resolution is the vital thing; and if that was within the power of the board to pass, it is conclusive of the adjustment of the account, if adopted with knowledge of the proper facts. It certainly worked no injury to any one that three or four hundred small orders, which the county was liable to pay, were condensed into one large one not increasing the county's liability. The suggestion was not an unnatural one, that time in some way should be allowed for payment of the amount to enable the county to collect it of the treasurer and his sureties, and not to compel it to raise it by tax.

The defendants, however, go back of the resolution and prove that nearly all the orders held by the bank, which were then given up and cancelled, had been previously paid by the treasurer. This evidence was taken subject to objection, but it was clearly admissible in the aspect in which I have examined the case. The vitality of orders once paid by the treasurer was destroyed, and they could not afterwards become a claim in the plaintiff's hands against the county. But to account for its possession of paid orders, the plaintiff shows that its cashier exchanged with the treasurer unpaid orders, which were few in number, for a large number of small jurors' certificates and

poor-house orders which the treasurer had paid. The transaction, although somewhat singular and perhaps suspicious in its character, would really result in no wrong or injury. For although the bank would hold orders, the vitality of which was destroyed, yet the debt represented by the valid orders exchanged for them, would not have been paid, and that would sustain the settlement made with the board of supervisors in November, 1843. I cannot, from the testimony in relation to the exchange of the jurors' certificates, perceive that any wrong was done to the county, or that it gave the treasurer any greater power to do wrong than if it had not been made. These certificates had not been allowed to him in the adjustment of his accounts and then exchanged for another description of vouchers on which he could obtain an additional allowance for the same amount. The transaction seems to have been a mere exchange of vouchers before any of them had been allowed to him in settlement. This, however, was not the case with the exchange of $800 made in November, 1842. At that time the board of supervisors were about to hold their annual meeting, when the treasurer's accounts would be examined by them. The bank held unpaid orders on the treasury to the amount of $3000 : the treasurer applied to the cashier and obtained from him the $800 worth, as he said, to show before the board, and gave in exchange for them his check, which he took up the next spring with an equal amount of paid poor-house orders. The effect was that the treasurer, in November, 1842, obtained a credit with the county for the amount of the orders as for so much money paid, and as after such credit he was then in arrear to the county $682,42, it necessarily follows that without the orders he would have been found a defaulter to nearly $1500. It is true that the treasurer paid the bank nothing for these orders, and the debt to the bank to that amount remained unextinguished, yet as by the act the bank put it in the treasurer's power to obtain credit with the supervisors to the amount of the orders, as for so much money paid, it is estopped from asserting afterwards that the debt was not

in point of fact paid. So far as regards those orders, it must look to the responsibility of the treasurer. This very transaction may have prevented the supervisors from taking such precautions as would have ensured them against much loss by the treasurer, as without its aid the defalcation in November, 1842, would have been so considerable as probably to have excited action on the subject. The poor-house orders which were afterwards given to replace the receipt or check had been paid by the treasurer. And then, after the county funds had been appropriated to their legitimate purpose of paying them, they were transferred to the bank, not for valid existing claims against the county, but for a naked indebtedness of the treasurer himself. To permit such a transaction would be to compel the county to pay the same poor-house orders twice. On such a state of facts the plaintiff could not sustain a claim against the county on either the poor-house orders, the receipt or check given up for them, or the orders originally given for the receipt in November, 1842. Still, under the circumstances, I am inclined to think it was competent for the board of supervisors to adjust all these claims, and if they did adjust them after hearing all the facts, we could not go behind such adjustment. If it was made in ignorance of the material facts, it would be otherwise. The weight of evidence clearly was that the board did not know of the exchanges, and that the committee who conducted the investigation knew only of a few instances of large orders having been exchanged by the bank for small ones, as a matter of convenience, and nothing of the transaction in November, 1842, although there was some proof on the other side. Yet as it does not appear on what ground the referees made up their report, and as they reported for the plaintiffs the amount of the draft and interest as if it had been commercial paper, and as from the testimony a report under the common counts would probably have been reduced by the amount of the orders delivered the treasurer in November, 1842, I think the report should be set aside, and a new trial ordered.

McKissock, J. concurred.

Beardsley, Ch. J., concurred in the result without express-ing an opinion upon the reasons therefor.

Motion granted.