HAYES *vs.* SYMONDS and others, Superintendents of the Poor of Jefferson county.

Superintendents of the poor have capacity to contract a liability for supplies furnished for the county poor-house; which liability may be enforced by suit.

But where it appears that the credit for supplies thus furnished was given to a *fund*, in the county treasury, raised by virtue of the 50th section of the act for the relief of indigent persons, called the poor-house fund, instead of to the superintendents, and on the supposition that the goods would be paid for by a draft on the treasurer, no action will lie against the superintendents until an application has been made to them for an order on the fund, and they have refused to give it.

In such a case the question, to whom was the credit given, is a question of fact for the jury, or referees; and after it has been settled by them the court will not disturb their finding.

A construction of a statute, which construction repeals another statute, should be very clear; especially when the repeal is of a part of a statute, and it seriously mars the harmony of a system. *Per* GRIDLEY, J.

Hayes *v.* Symonds.

APPEAL, by the plaintiff, from a judgment of nonsuit entered upon a report of referees. The action was brought against the defendants as superintendents of the poor of the county of Jefferson, to recover the amount of an account for supplies furnished by the plaintiff for the county poor-house in the year 1848, before the defendants became superintendents of the poor. The complaint averred in substance that at the date of the making and accruing of the account sued upon, being from February, 1848, to September, 1848, Stephen Boon, Jabez Hunting, and Charles Sexton, jun. were superintendents of the poor of Jefferson county, and as such they purchased, received, and took the delivery of and from the plaintiff, at Watertown, Jefferson county, of certain articles of merchandise, consisting mostly of groceries for the subsistence of the paupers of the said county, and that the plaintiff was the sole and absolute owner of the accounts therefor, and that on or about the 17th November, 1848, the defendants were appointed superintendents of the poor by the board of supervisors of said county, and that they accepted such office—and claimed judgment for $65,33. The answer substantially denied all the allegations in the complaint, and insisted that Boon, Hunting and Sexton had no authority or power as superintendents to create in favor of the plaintiff a debt or liability against the defendants which could render the defendants liable to the plaintiff by operation of law, and that the account existed solely against the persons obtaining the goods, and could only be audited by the board of supervisors in favor of the superintendents who obtained and furnished the said supplies. That the defendants were not bound to credit, allow, settle and pay said account for supplies purchased as aforesaid, and were not personally or officially liable therefor. That the account sued upon had not been at any time presented to or allowed, settled or audited by the board of supervisors, in favor of the predecessors of the defendants or the plaintiff, and that by the statute law of this state no account can be audited by a board of auditors, for any services or disbursements, unless made out in items, and an affidavit of the correctness thereof made and filed : and that no such account and affidavit had ever been presented to or

audited by any person or board authorized by law to audit or allow the same, and that by reason thereof the defendants were not allowed to pay the same, and that the plaintiff could not recover against them. That the account sued upon had never been presented to the defendants, verified according to law. That no board of superintendents of the poor has any power to audit any account for supplies for paupers in any case, nor for any claim other than for personal services. That the articles of which the account consists, or some part, were purchased and obtained of the plaintiff by one Huntington and one Beebee, under pretense of being authorized to purchase on the credit of Jefferson county, and were originally charged to Jefferson county—whereas those persons were not authorized to create such debt or liability. That the account, duly verified, was never presented to the defendants or their predecessors in office; by reason whereof the demand was not a debt contracted within the scope of the authority given to superintendents. That the account was for a credit given to said Huntington and Beebee, or one of them, when no funds were appropriated or existed in the hands of the treasurer or of the superintendents to pay the account, and that no funds had been appropriated or provided for that purpose, which was known to the plaintiff at the time of the accruing of the account; that the superintendents have no authority to audit any account for supplies, or any claim except for *personal services of officers,* &c. and that no portion of the plaintiff's account was for personal services. The reply substantially denied most of the allegations in the answer, and the legal propositions alledged therein; and further stated that if the said Huntington and Beebee purchased said articles, they were respectively keepers of the poor-house at the time, and authorized and empowered to purchase upon the credit, and in the name, and for and in behalf, of the then superintendents, and insisted that the account accrued for supplies sold to the superintendents for the maintenance of the paupers in the Jefferson county poor-house, and denied any knowledge on the subject of no funds having been appropriated or provided to pay the account, or of there not being any in the

hands of the county treasurer or of the superintendents, for that purpose.

The cause having been referred to Robert Lansing, Calvin Skinner, and William C. Thompson, Esqs. was tried before them. After the plaintiff had rested his case, the defendants' counsel moved for a nonsuit, on the following grounds: 1st. That the plaintiff had not made out a cause of action, because it appeared in evidence that the credit was given to Jefferson county, or to the Jefferson county poor-house, and not to the superintendents officially. 2d. The account for which the plaintiff brought suit was for supplies, and was by statute made a county charge, and was by law to be audited and allowed by the board of supervisors, and could not be sued for in a civil action. 3d. That there was no evidence of any contract made with the plaintiff by any board of superintendents in their corporate capacity, or for which the defendants, as successors, could be made liable in this action. 4th. That if the court should hold that there was evidence of a contract with Boon, or with Boon and his colleagues, it was evidence only of a personal liability as against them, and not available against their successors, in this action. 5th. That it was admitted by the pleadings that this was a claim which the superintendents were not authorized to audit, settle or pay. 6th. That it was admitted by the pleadings that it never was presented to the board of superintendents. 7th. That it was admitted by the pleadings that there were no funds in the treasury appropriated to the payment of these claims. 8th. That superintendents of the poor have no power to contract a debt upon the credit of the county, nor have they any power to appoint an agent to do so. If they purchase supplies on credit, it is upon their individual credit, and is chargeable by them against the county, and to be settled with them on their accounting with the board of supervisors, and to be verified by them according to law. If the court should hold that any person except the superintendents could present this class of accounts, then it was insisted that by the statute the board of supervisors are constituted a board of auditors for settling, auditing and allowing this class of accounts, and no other tribunal can be resorted to unless by compulsory process, on

failure of the board to discharge that duty ; also that all the testi-
mony of the witnesses, of statements and admissions of Boon,
Hunting and Sexton, or John C. Hayes, were incompetent as
hearsay evidence. 9th. That in the answer the defendants set
up that this action could not be maintained against these defend-
ants, because no board of superintendents of the poor have
authority to audit any account for supplies or any other claim
than for personal services, and that no part or portion of the
plaintiff's account was for personal services, and which was
not denied in the reply.

A majority of the referees granted the motion for a nonsuit,
and reported accordingly, and judgment was entered upon their
report.

*J. Moore, Jun.* for the plaintiff.

*G. C. Sherman,* for the defendants.

*By the Court,* GRIDLEY, J. This case comes before the court
on an appeal from a judgment entered on a report of referees.
The claim of the plaintiff is founded on an indebtedness which
accrued for supplies furnished for the Jefferson county poor-
house while the predecessors of the present defendants held the
office of superintendents of the poor.. The defense relied on is,
that the superintendents, as a corporation, or in the character of
superintendents, never contracted the debt.

I. A question is made, whether an action can be maintained
against the superintendents, as a corporation, for supplies fur-
nished for the poor-house. Prior to the revised statutes it was
decided in the cases of *Gourlay* v. *Allen,* (5 *Cowen,* 644,) and
*Flower* v. *Allen,* (*Id.* 654,) that overseers of the poor were not
liable upon an *implied* assumpsit, for articles furnished or services
rendered for the paupers of their respective towns ; that they could
not make their towns the debtors for a demand not authorized by the
order of a justice of the peace. In *King* v. *Butler,* (15 *John.* 281,)
it was held that an overseer was personally liable on an *express*
undertaking to pay for the keeping of a pauper, without an order.

In *Todd* v. *Birdsall*, (1 *Cowen*, 260,) it was held that an overseer was liable on a contract made by his predecessor, which was within the scope of his authority and which he had, therefore, a right to make. Thus the law stood when the revised statutes were enacted, and the 4th article of title 4, (2 *R. S.* 473,) entitled, " Of proceedings by and against public bodies having certain corporate powers, and by and against the officers representing them," became a law. By the first section of this article, (the 92d of the title,) it was provided that actions might be brought by a large number of officers, among which were county superintendents of the poor, upon any contract made with them or their predecessors, and to enforce any duty or liability enjoined by law, &c. By the 96th section, actions were given *against* the same officers named in the 92d section, and by the 97th section it was enacted that in actions against superintendents of the poor, or overseers of the poor, to enforce any liability of the county or town, the defendants should not be held to bail. By the 102d and 103d sections, no execution was to issue on such judgment, but a transcript of the judgment was to be laid before the supervisors of the county at their next meeting, and the amount thereof assessed like other taxes, and paid by the county treasurer.

These provisions, it will be readily seen, were intended to constitute a system for the enforcement of claims in certain cases, in relation to which the decisions had been fluctuating and inconsistent. It was the intention of the legislature, as appears by the notes of the revisers, (3 *R. S.* 757,) to enact the law as laid down in the case of *Todd* v. *Birdsall*, and to provide the way in which a judgment should be collected, short of taking it from the pocket of an innocent officer.

A note of the revisers to the 97th section, refers us to the 1st and 2d titles of the 20th chapter of the first part of the revised statutes, for the cases in which actions are given against superintendents. This act " for the relief and support of indigent persons," prescribes the powers and duties of the superintendents of the poor. (1 *R. S.* 613.) By the 16th section they are declared to be a corporate body, whose duty it shall be to provide

Hayes v. Symonds.

suitable places for keeping the poor, where houses have not been erected for that purpose by the county; to establish prudential rules for the government of the paupers; to employ suitable keepers, officers and servants; to purchase furniture, implements, and materials that shall be necessary for the maintenance of the poor; and to sell and dispose of the proceeds of their labor. These provisions, with several others contained in subsequent sections, clearly contemplate a power to make contracts and to provide for the performance of them. To meet these expenditures it is provided by the 50th section of the act, that the superintendents shall annually make an estimate of the sum necessary for the support of the poor, and present the same to the board of supervisors, whose duty it shall be to raise this sum by assessment, and pay it to the county treasurer, to be by him kept as a separate fund, distinct from the other funds of the county.

In the 3d section of title 4, chapter 13, (1 *R. S.* 386,) are enumerated what shall be deemed county charges; and in the 12th subdivision is found the following: "The sums necessarily expended in each county in support of county poor-houses and indigent persons whose support is chargeable to the county." And by the 4th section of the same act it is provided, that "accounts for county charges of any description, shall be presented to the board of supervisors of the county, to be audited by them." Now who shall account for the sums expended in support of the county poor, but the superintendents who are charged with the duty of purchasing supplies and of hiring the laborers and servants for the poor-house? It is very clear to my mind that by comparing the two classes of enactments together, there is no statutory objection to the capacity of the superintendents to contract a liability for supplies for the county poor-house, which may be enforced by suit.

The law stood thus till 1832, when the revised statutes were amended by adopting the following provision: "The superintendents of the poor shall audit and settle all accounts of overseers of the poor, justices of the peace, and *all other persons,* for services relating to the support, relief and transportation of

county paupers; and shall from time to time, draw on the county treasurer for the amount of the accounts which they shall audit and settle." (*Laws of* 1832, *p.* 43, § 1.   1 *R. S.* 628, § 62.) These accounts must be made out in items, and verified by affidavit.   (*Laws of* 1847, *p.* 729, § 2.)   Now this cause was argued as though the comprehensive terms employed by the legislature would embrace claims for labor and services in the poor-house, or appertaining to the county poor.   I can not think such was the intention of the makers of the law.   It may all refer to the services of the overseer and justice in a case where the pauper was too ill to be immediately removed.   And the terms "all other persons," would be satisfied by construing it to mean, persons who performed any services—as transporting, for instance—in relation to the same class of paupers.   If this provision is to receive a broader interpretation—one that would embrace the claims of the laborers and servants at the poor-house—then there is no reason why the same enactment did not embrace the supplies for the county poor-house.   It would leave the latter to be the subject of contract under the 16th section of the act before cited, (1 *R. S.* 613,) and the other to be audited and paid by the superintendents, by order on the treasurer.   It is true that Judge Cowen intimated in 2 Hill, 45, that such a provision would not be inconsistent with the right to sue the superintendents for the same claim which they were bound to sit in judgment upon, and to satisfy, by an order on the treasurer.   But that case was more than doubted by Bronson, J. in 6 Hill, 245, and is utterly inconsistent with the decision in *Vedder* v. *The Superintendents of the Poor of Schenectady*, (5 *Denio*, 564.)   The construction which I put upon the statute in question would leave the general words to be controlled and limited by the subject matter of the enactment.   It would also prevent its operating to repeal so much of the other acts I have cited, as places services performed by the laborers and servants in the poor-house upon the same footing with the general supplies furnished for the paupers. There certainly is no reason why the male and female servants who labor in the poor-house should be subject to one rule of compensation, and the merchant who supplies the provisions to

another.  A construction which repeals another statute should be very clear.  And especially is this remark true when the repeal is of a part of a statute, and it seriously mars the harmony of a system.

For these reasons, I am of the opinion that the provision contained in the act of 1832 has no reference to services performed by the servants and laborers who are employed at the county poor-house.  But it was asserted on the argument, and was not denied, that the practice had universally obtained, for the superintendents to audit the accounts for the labor and supplies for the poor-house, and to draw orders on the treasurer to pay them.  The same practice seems to have prevailed elsewhere, from the history of the case of the *Chemung Bank* v. *The Board of Supervisors of Chemung County,* (5 *Denio,* 517.)  The fund raised by virtue of the 50th section of the act for the relief of indigent persons, is regarded in practice as a distinct fund, separate from any personal or corporate liability of the superintendents, called the poor-house fund, against which the superintendents have been accustomed to draw, for the discharge of all claims arising out of the support of the poor at the county poor-house.  This gives rise to the next question in the case, which is,

II.  Whether it did not appear on the trial that the credit was given for the goods which constituted the plaintiff's claim to the county of Jefferson, or to the Jefferson county poor-house ; in other words, to the *fund* instead of the superintendents' personal or corporate liability.  Whether the undertaking was not to rely on that fund, by receiving orders on the treasurer of the county, instead of any contract made with the superintendents in their corporate capacity.  It was known to the plaintiff that the amount raised for the support of the county poor was deposited with the treasurer of the county, to be kept by him as a separate fund.  (1 *R. S.* 627, § 50.)  It was also known to him (for it was charged on the argument as the universal practice, and not denied,) that by a general custom, the large class of accounts for labor and supplies at the poor-house were audited and settled by the superintendents, and paid by orders on the treasurer of the county, to be satisfied out of this fund.  Such knowl-

Hayes *v.* Symonds.

edge is also to be inferred from the course of business in the case now under consideration. Now it is proved by Mr. Moody, clerk of the plaintiff, that these goods were charged on the plaintiff's book to the "Jefferson county poor-house." So too, the order mentioned in folio 71, and signed by one of the superintendents, requests the plaintiff to "*pay Stephen Turner 6s. a week for 4 weeks and charge the Jefferson county poor.*" When it is remembered that there was a fund in the hands of the treasurer, known as the Jefferson county poor fund, on which the superintendents were accustomed to draw for such claims as that which forms the subject of this suit, it will be difficult to say that it was not the intention of both parties to look to the fund, instead of the superintendents, as the contracting parties. The order certainly pointed out this fund as the debtor, instead of the superintendents, either in their personal or corporate capacity. The goods were not charged to the superintendents, nor did the order authorize such a charge. The charge was made against the poor-house fund, which was perfectly well known to both parties, as well as the agency of the superintendents in giving a lien on it. Now if the credit was given to the fund, on the supposition that the goods would be paid for by a draft on the treasurer, then no action will lie against the superintendents till an application has been made for an order on the fund, and they have refused to give it.

The following cases will show how strict is the rule which holds parties bound to look to the persons or funds to which they have first given credit. In *Leggat* v. *Reed*, (1 *Car. & Payne*, 16; 11 *Com. Law Rep.* 301,) the suit was for work and labor in putting up a door at a house in Beaumont-street. The defense was that the defendant had nothing to do with the matter except to give an order on behalf of a Captain Earl, and it was proved that a bill had been sent in headed "Captain Earl." Parke, J. laid down the rule "that if the plaintiff had ever given credit to Captain Earl, he could never shift his claim to charge the defendant." He left it to the jury to say to whom credit was given, and they found for the defendant. In *Taylor* v. *Brittan*, mentioned in a note to this case, the plaintiff, a jeweler, sued for

a quantity of jewelry purchased by Mrs. Brittan. It appeared that when she bought the jewels she stated that she bought them for a friend in the West Indies, who would send the money for them as soon as received; to which the plaintiff assented. The bill delivered was headed " *Mrs. Brittan.*" Garrow, B. ruled that though Mrs. B. was a feme covert, yet if the jeweler gave credit to her and the remittances she was to receive from the West Indies, the action could not be maintained against her husband. In *Bentley* v. *Griffin*, (5 *Taunt.* 356, 1 *Com. Law Rep.* 131,) a new trial was granted, on the ground that the evidence showed that the credit was given to the wife.

Now this was a question of fact for the referees, and they have found that the credit was given by the plaintiff to the fund, and not to the superintendents. Having once given credit to the fund, the plaintiff can not change the credit, until the superintendents have refused to give an order on the treasurer. We are all satisfied that the finding was right. The evidence justified the finding. It would be a violation of good faith to hold that this action would lie against the superintendents, when the evidence showed that it was contemplated by both parties that the plaintiff should look to the fund, and to an order on the treasurer, for his pay. When they have refused to give an order on the treasurer it will be in season to sue them for a breach of contract. But if the testimony was less strong than it is, being a question of fact settled by the referees, the court would not disturb their finding.

As to the ruling alledged to be erroneous, suppressing and striking out certain questions, with their answers, we think the plaintiff should not complain of it. The questions suppressed, and the answers to them, are before us; and we think that whether suppressed or not, they would not change the character of the report. The nonsuit would be right, either way. The rule is the same as it would be on a case, on the verdict of a jury. Where the court can see that any error could not have injured the plaintiff who complains of it, no new trial will be granted for such error.

New trial denied, and judgment affirmed.