THE PEOPLE, *ex rel.* Alexander J. Thomson, *vs.* THE BOARD
OF SUPERVISORS OF THE COUNTY OF SCHENECTADY.

## THE SAME *vs.* THE SAME.

Inferior jurisdictions, such as boards of supervisors, which derive their powers
from the statute, have not the authority to reconsider, to review, reverse and
annul their own judicial action, when it has once been legally exercised.

When a board of supervisors have, by a legal quorum of their members, voted
upon a resolution " concerning the raising of money," under the statutory
authority to apportion the tax to be raised among the several towns and
wards of the county, " as seemed to them equitable and just," and such vote
has been entered by their clerk in the book of records required to be kept
by them, they have exhausted their discretion over that subject. They have
executed a judicial act, which is in effect a *judgment*, final and conclusive,
as to any power they can exercise over it by way of review or reversal.

If the board, after having passed a resolution of that nature, which has been
entered in their book of minutes, by the clerk, reconsider their action, by a
resolution for that purpose, and, by another resolution, again apportion and
equalize the assessments of value in the several towns and wards, upon a
new and different basis, the second apportionment will be held a nullity ; and
the board may be compelled, by mandamus, to attach collectors' warrants
to the tax books made out according to the original resolution.

Boards of supervisors exercise both judicial and ministerial functions; and af-
ter the judicial power has been exercised, a mandamus is the proper pro-
cess to compel the performance of the ministerial ; especially where there
is no other adequate remedy.

APPLICATIONS for writs of mandamus. The facts up-
on which the applications were made are sufficiently set
forth in the opinion of the court.

*S. W. Jackson,* for the relators.

*W. A. Beach* and *J. Sanders,* for the defendants.

POTTER, J. The first of these cases was an application
for a mandamus to compel the board of supervisors to ap-
portion to the several towns and wards of the county, the
aggregate amount of county charges that have been audited
by them at their present session, according to the valuation

The People *v.* Supervisors of Schenectady.

of real and personal estate in the several towns and wards, as apportioned and equalized by them, in pursuance of a resolution of said board, passed and entered in their book of minutes, by their clerk, on the 10th day of December, 1861, a copy of which resolution appeared in the papers.

The motion was opposed on the ground, that on the 11th day of December, 1861, the said board *reconsidered* their action of the previous day, by a resolution for that purpose; and then, by still another resolution, again apportioned and equalized the assessments of value in said towns and wards, upon a new and different basis. This latter resolution was also entered in their book of minutes by their clerk, and appears in the opposing papers. There are no controverted facts in the case that require consideration. At the time the first resolution was passed, a majority of the members of the board were present. They had therefore a legal quorum, competent to act, and their acts have the same binding effect as if all the members were present. The opposing papers disclose the fact that at the time the resolution of the 10th was offered, three of the members had departed, and that one other of the ten members had been excused, leaving six of the ten members of the board then present. Upon offering the resolution in question, of the 10th inst., another member attempted to depart, and was prevented, by two others, until after the vote had been taken upon the resolution. This member states that the force was sufficient to prevent his departure; but still he voted, and voted in favor of the resolution. He also states that he voted in favor of the resolution for the purpose of moving a reconsideration of the vote which was then being taken. This motive for his vote was doubtless anticipated, as one of the members present, *then,* moved to reconsider the vote, after which, and while the vote was being taken on the reconsideration, he departed from the room, without voting thereon. The motion to reconsider was, as appears by the minutes, negatived, and the board then adjourned. The next morning, the 11th December, all

the members being present, a resolution was offered, preceded by a recital of the manner of taking the vote on the resolution of the 10th, and of the detention of a member against his will.   This resolution was, to reconsider the resolution of the preceding day to apportion and equalize the assessment. The chairman refused to entertain it.   An appeal from the chairman's ruling was taken, and the vote put, by some one, whom, not stated, and the chairman was overruled, and the vote declared carried by a majority.   Another resolution was then offered and passed by a majority of the members then present, again apportioning and equalizing the valuations of real and personal property assessed in the several towns and wards in the county, upon which to issue collectors' warrants, upon a different basis of apportionment from that of the resolution passed on the preceding day, making the burthens upon some of the towns and wards greater, and upon some of them less, than by the former apportionment; and it was now charged by the relator, who was a supervisor, and a taxable inhabitant of one of the wards, and injuriously affected by the last resolution, that the board of supervisors intend to apportion the taxes of the county, for the charges against the county which they were bound to raise, upon the basis of the last resolution.   This intention was admitted by the defendants.

These are all the material facts in the first case above entitled, upon which the parties appeared upon an order to show cause.   The relator asked for a mandamus to compel the board of supervisors to act upon the basis of the first resolution; claiming that the board having once exercised their judicial discretion upon the question, thereby exhausted their power over the subject, and lost jurisdiction to act again in the matter.   The majority of the board, by their counsel, claimed that they possessed the power to reconsider their action, at any time before actually issuing their warrants, and consequently possessed the authority to act upon the basis of the latter resolution.   It is proper to add that the

board of supervisors adopted no rules to govern their action at any time during their session.

Some questions were raised by the defendants, upon undisputed facts, which it is well to dispose of, before proceeding to the merits of the main question in the case. The papers showed that while the vote was being taken on the resolution of the 10th, some person locked the only door of the room. It does not appear by whom this was done. It was a highly improper act, and doubtless amounted to a misdemeanor, on the part of the person who committed it. The statute (1 *R. S. 5th ed.* 855, § 32) declares, " The boards of supervisors shall sit with open doors, and all persons may attend their meetings." This statute, being construed according to its common sense meaning, is, that the doors shall not be locked; not technically, that they shall stand without being shut. Its real spirit doubtless is, to prevent the board from closing their doors so as to prohibit others from attending, and was not probably designed to interfere with the power of the body, (if such power they have,) to prevent the departure of their own members; nor does it appear that any member of the body directed the act to be done; or that it was the locking of the door that prevented the departure; but *other* causes. This act, therefore, standing alone, did not have the effect to invalidate the vote of the board, or to take from them jurisdiction to act. It was no compulsion that could have extorted a vote from any one; certainly not an *affirmative* vote, in favor of the resolution that was being voted on.

Another objection raised, was, that one or more of the members present, by force, prevented the egress of one of the members from the room, while the vote on the resolution of the 10th was being taken. This also was an improper act, an act of violence, amounting, perhaps, to an assault, but notwithstanding this a quorum of the whole body voted for the resolution, and this impropriety of conduct could not affect the validity of a voluntary vote of a quorum of the board.

So, too, the objection as to the motives of the board, or a majority of them, in taking the vote. This is not a question that, in this court, we are permitted to inquire into. This has been repeatedly and solemnly settled in this court: one case will suffice. In *Warren* v. *Devendorf*, (3 *Denio*, 120,) Beardsley, J. in speaking of the conduct of assessors, who in that case had been charged with acting corruptly, says: "They were acting in the performance of a public duty, in its nature judicial; they were not liable to an action, however erroneous or *wrongful* their determination may have been." "I prefer" (he says) "to place the decision on the broad ground that no public officer is responsible, in a civil suit, for a judicial determination, however erroneous it may be, and however *malicious*, the motive that produced it. Such acts, when corrupt, may be punished criminally, but the law will not allow malice and corruption to be charged in a civil suit against such officer, for what he does in the performance of a judicial duty. The rule extends to judges, from the highest to the lowest, to jurors, and to all public officers, whatever name they bear, in the exercise of judicial power." I cannot, therefore, inquire as to the motives of the persons who detained a fellow member from departing, nor into the propriety of his motives, for attempting to leave them without a quorum to do business. I must assume, for the purposes of deciding this question, that these public officers, acting under the solemnity of their oaths, acted in good faith, and only with an honest desire to discharge their duties, and that they are willing to obey the law.

The explanation given by one of the body, that he voted in the affirmative on the resolution of the 10th with intent to move to reconsider at another day, falls within the same rule, that the motive we cannot here consider. If the power to reconsider existed, it was exercised at the time. If it was proper for any one, it was equally proper for the member who moved it. And in the absence of rules, I know of no law

The People *v.* Supervisors of Schenectady.

that exhausts the right to reconsider from being perpetual, in all cases, *where they have the power* to reconsider.

The question before the court, then, upon this point, is narrowed down to the effect of the votes of the board of supervisors upon the resolution of the 10th December, apportioning and equalizing the assessments upon the several towns and wards of the county; the vote to reconsider; and the vote fixing a new and different apportionment and equalization, by the resolution of the 11th December.

The power to make this apportionment, (at least once,) is an express power conferred by statute, (1 *R. S. 5th ed.* 848, § 3,) in the following terms: "The board of supervisors of each county in this state, in addition to the powers now conferred on them by law, have power at their annual meeting or when lawfully convened at any other meeting." Sub. 2: "To apportion the tax so to be raised among the several towns and wards of their county; *as shall seem to them to be equitable and just.*"

The questions that are presented, are, 1. What is the character of the action that is so to be exercised, under this statute authority? Is it legislative, ministerial, or judicial? 2. When the power has once been exercised, can it be reversed, reviewed, or reconsidered and annulled, by the same body?

1st. It is clearly not within the ordinary meaning of *legislative* power, which is, to enact or make laws. It is to act under a law already made. The sovereign power, in that respect, is the legislature. Reconsideration is a power that appropriately belongs to legislation. The power that can make and unmake includes the power of reconsideration. Though boards of supervisors have certain limited legislative powers conferred upon them, the statute above cited does not confer legislative power.

It is as clearly not a mere ministerial or executive duty, like the acts of a sheriff or constable, where no exercise of discretion is demanded, or the performance of that which is

directed by another. The act in question requires the exercise of thought, consideration and judgment, and is independent of any other power.

I have been unable to characterize the action of the board of supervisors in the passage of a resolution for the purpose specified, as other than *judicial* action. By *judicial* action is meant, in legal understanding, that which requires the exercise of judgment or discretion, by one or more persons, or by a corporate body, when acting as public officers, in an official character, as, in the language of this statute, " *shall seem to them to be equitable and just.*" This is to me, clearly, a power demanding judicial action. I need not cite authority upon this proposition.

2d. The only remaining proposition to be considered upon this point is, have inferior jurisdictions—have boards of supervisors, bodies who derive their power from the statute—the authority to *reconsider,* to *review, reverse* and *annul* their own judicial action, when it has once been legally exercised ? If they do *not* possess this power, then the resolution passed on the 10th day of December, by a legal quorum of their body, is in force. Their action in effect became a judgment, in which every citizen of the county who would be benefited thereby, or who would be injured by its reversal, acquired by its passage a vested legal right in its benefits, which can only be changed by a direct review in this court, for good reason to be shown ; and cannot be reviewed by themselves, or by any other body, collaterally. If this board do possess the power of reconsideration, review, and reversal, then the resolution of the 11th December, or some subsequent resolution which shall reconsider and reverse that, may be in force, and the power be exercised by them, *ad libitum,* and that of the 10th of course be nullified. This power to reconsider and reverse, then, is the *question.*

It will be seen that by the constitution of this body of men by statute, they are a quasi corporation, created for special purposes, and clothed with special powers.

They are an anomalous body in one respect; in that the authority conferred on them is, in each of the several departments, to exercise severally legislative, executive, and judicial power. Their proceedings are required to be solemnly and appropriately conducted. They have power to appoint a clerk, "whose duty it shall be to record in a book to be provided for the purpose, all the proceedings of the board; to make regular entries of all their resolutions or decisions, on all questions *concerning the raising or payment of moneys;* to record the vote of every supervisor on any question submitted to the board, if required by any member present." (1 *R. S. 5th ed.* 858, § 50.) The proper mode by which they render themselves liable, is by resolution entered in their minutes. (*5 Denio,* 523.)

The proceedings in question were, as we have said, judicial proceedings, entered by their clerk in their book of records, with the solemnity of entering the name of each supervisor as he voted on the resolution; and the resolution was, "*concerning the raising of money,*" because it was the basis upon which the whole money for taxes of the county was to be raised.

I have been forced to come to the conclusion, upon authority, that when this board, by a legal quorum of their members, had voted upon a resolution, "concerning the raising of money," under the statute authority to apportion the tax to be raised among the several towns and wards of the county "as seemed to them equitable and just," and when this vote had been entered by their clerk in the book of records so required to be kept by them, they had then exhausted their discretion over that subject; that they had then executed a judicial act; that such act was in effect a judgment, final and conclusive as to any power they could exercise over it by way of *review* or *reversal.* It had not only the form of judicial action, but was entered of record—a judicial judgment—upon which a warrant of execution could issue. The case of *Jermaine* v. *Waggoner,* (1 *Hill,* 279,) was a case

where the statute in relation to the construction of the Crooked Lake canal authorized the canal commissioners to cause surveys to be made, and to adopt a plan for the construction of the work preliminary to the commencing of the work. This was done. Subsequently it was found necessary, by the canal commissioners, to raise the gates at a dam, to increase the supply of water for the public work. By this additional rise of water the plaintiff was injured, for which he brought the action. The court said, "The statute expressly directed them to procure and adopt a plan. It had reference not only to the expense of the work, but to the manner in which the flow of the water might be modified. The height to which the water was to be raised, and the manner in which it was to be regulated, was a most material object of inquiry in fixing on a plan. And any departure from it, even in the structure of the state dam, injuriously affecting the citizen, would form a ground for the recovery of damages. *The commissioners having once passed upon the question, their powers were all at an end.* These powers were quasi judicial. The adoption of a specific plan, was but another name for the rendition of a judgment by a court of limited jurisdiction. Such a step is, in its nature, irrevocable, and incapable of modification." "In this respect, the power under which the canal commissioners acted, resembles that of commissioners of highways or streets," &c. "Where a judicial body is limited to a single act, by the performance of the act, their power becomes *functus officio.* Jurisdiction over the matter thus ceases, and must be regarded for all purposes as if it had never existed." The same doctrine was held in *Woolsey* v. *Tompkins,* (23 *Wend.* 324,) as applicable to judges of the court of common pleas in reversing the order of the commissioners of highways, &c. in laying out a road. Nelson, J. said, "They are not permitted to *review* and *alter* what they have done judicially." Though they may correct a certificate containing an error in mere description, that, say the court, "is a mere *ministerial* act." It

was held in *Martin* v. *The Mayor of New York*, (20 *How. Pr. Rep.* 86,) that the marine court of New York had no power to open or vacate its own judgment. This, it seems, was because the legislature had granted to them no express authority to do so. They being a court of inferior jurisdiction, the power was held not incident to their other powers. (*See also opinion of Spencer, J. to the same effect, in the matter of Beekman street,* 20 *John.* 271, 273.) The case of *People* v. *Ames*, (19 *How. Pr. Rep.* 551,) was a case where the board of supervisors of Oswego, acting under the authority of the laws of 1847, giving authority to them to limit the number of superintendents of the poor to one, passed a resolution so limiting the number. The board of a subsequent year passed a vote restoring the number to *three*. The court, at general term, say, "The board of supervisors are acting under delegated powers. They are confined to those powers actually conferred; they take nothing by implication; and hence, when a power is given to them to reduce the number of incumbents of the office, it does not authorize them to increase the number." "It seems to me," (say the court,) "that where the board has passed a *resolution* to reduce the number, *their power over the subject is wholly at an end.*" So, too, it was held that a referee in this court, after he had signed his report and given notice, lost authority over the case. (*Ayrault* v. *Sackett,* 17 *id.* 508.) In *Supervisors of Onondaga* v. *Briggs,* (2 *Denio,* 26,) an officer had taxed a bill of costs, which the court said was a *judicial* act, and they compared it to decisions made by officers, commissioners and others, under the insolvent laws, which, when made, are conclusive upon all the parties until they have been *reversed, vacated* or *set aside* in the forms prescribed by law. Bronson, Ch. J. said, "This principle extends alike to the decisions of the highest court and the humblest officer in the state who has been entrusted with the exercise of judicial powers. If, when a matter has been settled in the form prescribed by law, either party may disregard it and litigate the

matter over again, we shall have nothing but endless strife and controversy." This, I think, must be the rule. There must be a *point* at which to stop. If it can be reviewed the next day, it can the next week, month or year; for though the *members* of the body change, the body itself does not; the same quasi corporate body always remains—it is the same continued body. (*Supervisors of Chenango* v. *Birdsall*, (4 *Wend.* 460, 461, *per Marcy, J.*) As Judge Bronson remarks, (2 *Denio*, 34,) "No community could long endure such a state of things as this new doctrine would be likely to bring about." Boards of supervisors are called bodies of inferior jurisdiction, that is, their powers are *special*, and limited by statute, and they must keep strictly within the bounds of their authority; they cannot transcend the power conferred. (5 *Denio*, 521. 6 *Hill*, 245.) *The People* v. *Lynde* (8 *Cowen*, 134) is a strong case to the same effect. (*Same* v. *Marine Court*, 12 *Wend.* 220.) *No power is conferred upon them to review, reverse or vacate their own judicial action.* They have exhausted their power in this respect when it has been once exercised; consequently, the attempt to reverse their action on the resolution of the 10th December, was without authority, and void. What remained to be done after that, was the mere *ministerial* act of carrying out the figures and affixing the warrant.

This was the state of the first case, when brought before me upon the application to order the board to proceed upon their resolution of the 10th, when they had resolved to proceed upon that of the 11th December. In a hasty examination of the case, then taken, I came to the same conclusion that I have now reached, upon a more deliberate review. Assuming, as I then did, that the board acted in good faith, but with mistaken views of their powers, I so advised them, and cautioned them that all action based upon their subsequent proceedings would be a dangerous experiment to them, if persisted in; that it might put at hazard the whole means intended to be raised to pay the public creditors, and block

the wheels of government, local, state and national; that it might subject each member of the board by whose vote it was insisted on, to an action, and to liability for directing the collection of taxes based upon a warrant issued upon a judgment void for want of jurisdiction, and advised them that it was prudent to avoid such a hazard. They then still possessed the power to act ministerially upon their proper legal action. But I also informed them that in consideration that the writ of mandamus was a high prerogative writ, of extraordinary power, it ought not to be put in exercise when its effects upon the public interests might be so serious, if the parties to be injured were provided with any other adequate remedy. That it appeared to me that the relator, and others affected, or to be affected, had a remedy by action at law against those who should issue a void warrant and sell their property. That in consideration of the great inconveniences that would result to the public, by checking or delaying the action of the board; that the injured parties were not remediless, and that the board still had power to act in obedience to the law and their duty, I withheld the writ. A majority of the board of supervisors thought differently as to the law, and the individual members of the majority, declining this advice, carried out the tax in the columns of their books, according to the basis of the resolution of the 11th December. A minority of the members, adopting the advice, extended their figures, in the books, upon the basis of the resolution of the 10th. And the case secondly above entitled, is an application of a minority of the board, for a mandamus, to compel the board to attach collectors' warrants to such books, made out according to the first resolution.

This second case came on upon Saturday the 21st instant. It was the duty of the board, by statute, to have completed their duties, and to have delivered the books, with warrants attached, to the collecting officers, on or before the 15th day of December.

The board had now adjourned until Monday morning the

23d inst. to complete their duties, by signing the books, and attaching the warrants. · The same question, as applicable to a board of supervisors, in all its bearings, and especially as to their power to *reconsider* and *reverse,* had never been directly adjudged, that I was aware of. The case was new, and involved in its consequences interests of great moment. The decision, if correct, was to settle not merely the question then before me, with its consequences to the defendants, and to the county of Schenectady, but the decision, if sound, would settle the law that shall control the action of boards of supervisors in every county in the state. If unsound, it would of necessity involve suitors in the extraordinary expenses of carrying the decision to a higher tribunal for review, and correction. In view of these considerations, and of the fact that the question was, as to the exercise of powers in which the people at large were concerned, and that great detriment and public inconvenience might result from interfering with their proceedings, I was unwilling to take upon myself, in the few hours left to me for the examination of the question, the responsibility of issuing this somewhat extrardinary mandate; and therefore took farther time for its consideration; and claiming the right, which was professedly desired by all parties, to consult with my brethren thereon. In now declaring the view I have taken of the law, and in some degree under such consultation, it will be entirely unaffected by the facts that it appeared on the hearing that after the service of the order to show cause for this motion, a majority of the board attached their warrants to the assessment rolls, and issued them to the executive officers, in all the towns and wards of the county represented by the members of the majority, upon the basis of the resolution of the 11th of December. And it is not before me judicially, what action was taken by the majority of the board on the morning of the 23d, before this decision was made.

It was forcibly argued that the resolutions of apportionment, even if judicial in its character, was only one of a series

of successive judicial acts, each dependent upon, or affecting the others, all remaining incomplete and imperfect ; like different judicial decisions in the progress of a trial in courts ; all to be consummated and blended in one judgment, in which all the particular acts are merged at the end of the trial; making at the end but one complete judgment.  The argument is ingenious, but is not sound.  The statute confers the power, and points out this *one* separate act to be performed, alone, by itself.  It is disconnected with any other judicial action of that body.  It is based only upon the action of the several assessors, which precedes it; and when this act has been performed by the board, all that follow are the mere ministerial acts of extending the figures into the columns, by the rule so judicially fixed ; and of attaching and signing the warrants for the collectors.  These latter are ministerial acts, that require no exercise of discretion.   (*Woolsey* v. *Tompkins,* 23 *Wend.* 324.  *Morse, petitioner,* 18 *Pick.* 446.)  These cases establish that judicial tribunals also exercise ministerial functions, and that in such cases, after the judicial power has been exercised, a mandamus is the proper remedy to compel the performance of the ministerial ; especially where there is no other adequate remedy.  Where a judicial body have found all the facts necessary to a judgment, so that the judgment is nothing but the conclusion of law upon these facts, the entering up of the judgment is, in its nature, ministerial, and a mandamus is the proper remedy to enforce the duty. In *Carpenter* v. *Commissioners of Bristol,* (21 *Pick.* 259,) application having been made to the commissioners to lay out a road and estimate the damages, Morton, J. said, this duty was judicial.  Having estimated the damages, the issuing of the warrant was a ministerial duty, which, if they refused to perform, the court would issue this mandate to compel them.  (*See also* 22 *Pick.* 266.)  Nor is the analogy, insisted on between the proceedings of courts of general jurisdiction and bodies of limited and inferior jurisdiction as to the various steps in the trial of a cause ending in one judg-

ment, good. In the former, every intendment of law is in favor of their power; they do not lose jurisdiction by mistakes; and each several error can be reviewed and corrected, on exception, and direct appeal. In the latter, jurisdiction must be shown at every step; no *direct* appeal can be had to correct their errors; and transcending their jurisdiction, is fatal. (*Bangs* v. *McIntosh*, 23 *Barb.* 601, 2.) The proceeding will be void whenever it is brought up, if wanting jurisdiction. (1 *Hill*, 139. 10 *Barb.* 110.) Their acts are not merely voidable, but absolutely void. They constitute no justification. All persons concerned in issuing process to execute such judgments, are considered in law as trespassers. (4 *Seld.* 259. 5 *Denio*, 517. 6 *Hill*, 244. 1 *Kernan*, 563. 3 *Denio*, 120, 1, *and authorities cited*.)

The argument that the establishment of such a rule as we have laid down, in relation to the powers of this board, would be greatly inconvenient and impracticable; that the practice has been otherwise; that it would deny to these officers the necessary power properly to discharge their duties, has been considered. If these reasons are good, they must be addressed to the legislature, who, in their wisdom, have withheld the power, and who alone can confer it. The duty of the court is to interpret the statutes. They can neither make the law, nor can they mould and warp it, to meet their own ideas of policy, wisdom, or expediency. They must construe the statutes, conferring the power upon this board of inferior jurisdiction, by the same rule of construction that applies to all other bodies of limited power. If greater powers are necessary than they now possess, it is for the legislature, not for the courts, to grant it. That mistakes, errors and oversights will occur in the proceedings of these bodies that require correction, is almost a matter of course. They occur in all human tribunals; they occur in the courts, as well as in these bodies. Where they happen in *ministerial* proceedings, either in these bodies, or in the courts, they can be corrected by the same body, as we have shown. (23 *Wend.* 234.) But

a clear distinction exists—a distinction based upon the best of reasons—forbidding them to *reverse* or *annul* the result of *judicial* action. The very idea of judicial action implies the exercise of thought, reflection, deliberation, judgment. When these have been bestowed upon a subject, what more can be done? How can mistakes occur? Why should they occur in this, more than any other body of men, to make the power to reconsider necessary? *Reconsideration,* which, applied to judicial action, is but another name given for the exercise of the power to *review,* to *reverse,* or to annul their own judgment, and which includes them all, must of itself, also, be the exercise of judicial power. Here, too, mistakes and errors in the *reconsideration* may again occur. If therefore this latter power exists, it exists without limit; so that reviews, reversals and reconsiderations can be had, and new judgments can be entered and recorded by the same body of men, unrestricted; and the *power* remain inexhausted by the exercise. If this can be the law, it must be based upon the presumption that the last exercise of discretion and judgment is superior in power and wisdom to all that have preceded it. This is simply absurd. No other inferior jurisdiction in the state has ever been held to possess such extraordinary powers. Such power is certainly not *expressly* conferred. It is not *incident,* nor *necessary* to the exercise of any conferred power. If the absurdity of this claim to the exercise of the power in question was necessary to be made more conspicuous, no case could be presented for that purpose, more appropriate than this. We have already shown that the courts of highest jurisdiction in the state will never inquire into the *motives* of judicial action. This power, however, was exercised by the board of supervisors in this case. Their action was based upon the *motives,* which produced the resolution of the 10th December, not on account of any *accident, mistake,* or *error,* but upon *motives* only. The preamble to the resolution of reconsideration sets forth the impeachment; and the body forthwith constitute themselves "a court of impeach-

ments" to try the offenders; and not that only, but extraordinary as it may appear, a court to try themselves; wherein the accuser and the accused, as well those who were absent at the commission of the offense, as those who were present, with equal judicial powers, vote upon the *motives* which influenced the previous *judicial* action of a part of their body. And that too, without allowing the accused the common right to plead not guilty, and have a trial upon the facts; but without proof; taking only the recital of the matters set forth in the preamble to the resolution to be true. At least, four of the members so voting to impeach, who were absent at the occurrence, and who knew nothing of the truth of the statement, *except upon hearsay,* acting upon their solemn *oaths, judicially* voted, upon such hearsay, *that the facts stated in the preamble were true.* Is it for such a body of men, so trifling with solemn oaths, so mocking all forms and decencies of trial, and for the exercise of such powers, that this court is asked to enlarge *by construction* the meaning of statutes? Does this case illustrate the necessity? Does it satisfy the mind as to the certainty of this body being a safe depository of such extraordinary power? If there be any other argument in favor it might perhaps be also urged, upon the apparent impartiality of the vote on the impeachment: which was in effect an impeachment of a majority of their whole body. And the fact that three of their number, after only one night for repentance, actually voted for their own impeachment; and perhaps, it may be urged, upon the further consideration of the exhibition of that spirit of charity and forgiveness, resulting from the *conviction,* which prevented the sentence of disqualification usual in impeachments, that the impeached members cannot further act. And these absurdities not only: it appears that when they had thus purged themselves from *impurity,* by their votes, they had thereby affected such a moral reformation in their body that they permitted a free intercourse, in their subsequent performance of duties, with the impeached members; without

apparent fear of contamination. *Such is the result of the exercise of the power to reconsider judicial action,* now presented to the court; now claimed to be possessed; and claimed to be necessary.

For myself, I have not seen in this exhibition any thing demanding a more liberal construction of power than has been given to such bodies. It is essential to an impartial administration of justice, which is regarded as one of the best securities of the rights and liberties of the citizen, that the power of these inferior bodies should be limited to the exercise of the powers that are expressly conferred. It was never designed that judicial power should be committed to the hands of arbitrary judges, whose decisions may be regulated only by their own changing and capricious opinions not in harmony with the fundamental principles of law. Judicial power subject to no restraint but the arbitrary and interested will of the officer, subject to be controlled by political, interested, or corrupt combinations, is ten fold more dangerous to the public interests; far more destructive of confidence, than all the inconveniences that will ever result from holding this inferior body as all other similar bodies are held, to limited and restricted powers. There is no power conferred upon any one to prorogue them if it should be seen that they are intent upon evil. There is no direct appeal from their judicial action. If they act corruptly, while acting judicially, their corrupt action cannot be collaterally examined. If leagues and conspiracies are formed, and improper action based upon them, no private or civil relief can be obtained, except when they exceed their jurisdiction. The sad history of unrestrained jurisdiction has taught us that these bodies are no more free from suspicion, while exercising the power in question, than others. Complaints of combination and impropriety are not unfrequent. Why then should the ordinary rules for the interpretation of statute conferred power be departed from? I have been unable to find a reason. Nor should the fear of subjecting the individual members of the

board to the consequences of acting without authority control, or in any respect influence, the action of the court. The law is not made to bend or yield its influences *for hard cases.* If it did, it would cease to be a rule of action. It has been well remarked by a distinguished jurist, "that it was the *hard* cases, that made the bad law." It is better to suffer such cases, than to give effect to usurped authority, in these inferior jurisdictions. The presumption is that this body knew the law. They take their office subject to its responsibilities. In this case, as to the warrants they had already issued, they acted with their eyes open, and with forewarnings as to their duty. The court must pronounce its judgment, leaving consequences where they belong.

The office of the writ of mandamus is, to require the body or officer to whom it is directed to do some particular thing, therein specified, which appertains to their office and duty, and which the court in issuing it has determined to be consonant to right and justice. (12 *John.* 415.) It is always issued where the party applying shows a legal right and is without any other specific legal remedy. And in modern cases it is held to be appropriate to issue it against corporations and ministerial officers, to compel them to exercise their functions according to law, notwithstanding they may be liable to an action on the case for neglect of duty. (23 *Wend.* 458.)

Upon a more deliberate examination of this case than I had been able to give at the time, on the argument, I have come to the conclusion that this is a proper case for a mandamus, upon the application that is made, to compel the board to perform the *ministerial* duty of attaching the warrants for the collection of the tax, in the wards represented by the relators, according to the judicial action of the board on the 10th day of December instant. The vigorous and compulsory power of the court should *then* have been put in exercise. It was proper, to compel the performance of duty. It was proper, to prevent litigation and controver-

sy with the county. It was proper, to protect even the officers themselves against the consequences of their own imprudence.

Let the mandamus issue, as demanded.

[SCHENECTADY SPECIAL TERM, December 23, 1861. *Potter*, Justice.]