Magee *v.* Cutler.

proceedings are pending, and annul them in advance. For these reasons I think the writ of certiorari issued in this case should be quashed.

[MONROE GENERAL TERM, December 23, 1864. *J.* ❦ *Smith, Welles* and *E. Darwin Smith*, Justices.]

————— ♦♦♦ —————

## JOHN MAGEE and others *vs.* GEORGE D. CUTLER and seventeen others, Supervisors of Livingston county.

A suit in equity against supervisors of a county, to restrain them by a perpetual injunction from imposing a tax which will be a lien upon the plaintiffs' lands, and a cloud upon the title thereto, can not be sustained upon the ground that it will prevent a multiplicity of suits, where it does not appear that any one has sued the plaintiffs, or threatened to sue them in respect to such tax.

In such a case, if the proceedings to levy and impose the tax are illegal and invalid upon the face of the record, a single action at the suit of the people, upon a common law certiorari, after the proceedings of the supervisors to levy such tax are completed, will bring up the whole proceedings for review, when they can be reviewed, or set aside and quashed. The persons whose lands are subject to the tax can also defend themselves, in a suit at law against them, and the proceedings will not constitute an apparent cloud upon their title.

Nor is it a ground for equitable interference that the proceedings to impose the tax are, or appear to be, fair and valid upon their face, and that extrinsic facts are necessary to be proved in order to establish the invalidity of bonds issued by the supervisors in pursuance of the resolution for the levying of the tax, which can not be brought before the court on a writ of certiorari.

Inasmuch as a certiorari goes to review a judicial act—a consummated judicial decision—a proper return to such writ will bring up, as a part of the record, whatever entered into, or was necessarily passed upon, in the decision of the question sought to be reviewed.

At a meeting of the board of supervisors of the county of L., on the 3d day of August, 1864, a resolution was adopted in pursuance of chapter 8 of the laws of 1864, authorizing the levying of a tax to pay bounties to volunteers, by which the county treasurer was authorized to issue the bonds of the county to the several supervisors, to pay bounties to recruits that should be mustered into the service of the United States to the credit of the re-

spective towns, under the president's call of July 18, 1864, for 500,000 men. By another resolution of said board, passed on the 3d of September, 1864, each town in the county was authorized to increase its bounties to $1,000 and the treasurer was empowered to issue bonds to the respective supervisors at the increased rate.    On the 16th of September, 1864, a draft was made, to fill the quota of the town of G. under the said call, amounting to twenty-nine men, which produced nineteen men, who, after inspection, were accepted on such quota.    On the 23d day of the same month a special town meeting was held, in said town of G. at which it was resolved to pay a bounty not exceeding $1000, and that the same be assessed and collected from the taxable property of said town.    Subsequently, the supervisor of said town demanded and received from the county treasurer twenty-nine bonds for $1000 each, which were negotiated by him and the avails used for the purpose of procuring substitutes for the persons so drafted from that town.

*Held,* that the supervisor of the town of G. was duly empowered to receive from the county treasurer the bonds of the county, and to apply such bonds, or the proceeds thereof, in paying bounties to volunteers to fill the quota of the town ; and that the draft, which took place on the 16th of September, did not render such use or appropriation of the bonds or the proceeds thereof unlawful by filling the quota of the town, so that no volunteers could thereafter be legally called for or required from said town.

*Held, also,* that in respect to the manner in which the supervisor of G. procured volunteers to fill the quota of that town, the spirit and intent of the statute, and of the resolutions of the board of supervisors and of the town meeting, were fulfilled and complied with.

One who freely enlists in the place of another, and becomes his substitute of his own free will and accord, is a volunteer, within the spirit and intent of the statute.

A resolution of a board of supervisors, providing for the issuing of county bonds to each supervisor who may call for the same, to pay a bounty of a specified amount to each recruit that shall be mustered into the service of the United States, to the credit of their respective towns, is a provision to issue the bonds upon the credit of the county ; and the bonds issued under it are a county charge, and binding on the whole county.

Such bonds, being issued under the authority of the board of supervisors, upon the credit of the county, are valid bonds of the county ; and it is the right and duty of the board of supervisors to provide accordingly for their payment, as legitmate public debts of the county.

Freeholders and tax payers of a town, owning lands in severalty, but not having any common property, can not join in a suit in equity to restrain the collection of a tax assessed upon all the lands in the town.    They have no common interest in the subject in controversy, to entitle them to join in the action.

When a county is to be sued, the action must be against the board of supervisors, and not against the individual members.

Magee *v.* Cutler.

MOTION to dissolve an injunction upon the complaint and affidavits. The complaint sets forth that the plaintiffs, seven in number, are residents, freeholders and tax payers of the town of Groveland, in the county of Livingston, having both real and personal property liable to assessment and levy for the payment of taxes; that the action is one of a common or general interest to many persons, and that such persons are so numerous that it is impracticable to make them all parties; and that the action is prosecuted for their benefit as well as that of the plaintiffs; that the defendants named are the supervisors of the several towns of the said county of Livingston. The complaint further states that on the 3d day of August, 1864, at a meeting of the supervisors of said county, duly convened and held, a resolution was adopted in pursuance of chapter 8 of the laws passed at the session of 1864, by which the treasurer of Livingston county was authorized to issue the bonds of said county to each supervisor who might call for them, to pay not exceeding $300 to each recruit that should be mustered into the service of the United States to the credit of his town, for the term of three years, and not exceeding $200 to each recruit mustered for one year, under the call of the president of the United States for 500,000 men, issued on the 18th day of July of said year. That each supervisor was to be the receiving and disbursing agent of his town, and to draw from the treasurer such an amount as would pay the quota of his town at the said rates; and that by another resolution passed by said board on the 3d of September thereafter, each town in the county was authorized to increase its bounty to a sum not exceeding $1000, and authorizing the treasurer to issue bonds to the respective supervisors at that rate, subject to the resolutions of the 3d of August aforesaid.

The complaint further states, that on the 23d of September, thereafter, a special town meeting was held in said town of Groveland, at which it was resolved to pay a bounty not

exceeding $1000, and that the same be assessed and collected from the taxable property of said town. That said town of Groveland is a sub-military district of the 25th congressional district of this state, and as such was liable to a draft for the quota of twenty-nine men. That on the 16th of September, preceding said town meeting, a draft was made to fill said quota, of fifty-seven persons, of which the first twenty-nine who should, upon inspection, be found to be able bodied men, became liable to military service to fill said quota. That nineteen of said men were duly inspected and found able bodied, and were accepted on said quota, and that of the residue drafted more than the requisite number are able bodied and liable to do military duty. That after such town meeting the supervisor of said town demanded and received of the county treasurer twenty-nine bonds, drawn in pursuance of the said resolutions of the board of supervisors, for $1000 each, and said bonds were negotiated by him and the avails used for the purpose of procuring substitutes for the persons so drafted from said town; the said supervisor using said bonds or the avails thereof for the said purpose under the pretense of procuring volunteers. That the board of supervisors have taken the preliminary steps to allow said twenty-nine bonds either as a claim against the said county of Livingston or the said town of Groveland. And the complaint avers that it is the purpose of the defendants, composing such board of supervisors and acting as a board, to assess, impose and levy the amount of said bonds either upon the taxable property of the said county or of the said town of Groveland. The complaint alleges that the defendants, as such board of supervisors, have under consideration the question of imposing and levying the amount of all the county bonds issued to the various towns of said county under said resolutions and in pursuance of the action of said towns at special town meetings, including the bonds issued to said town of Groveland, upon the taxable property of the county, or assessing the same thereon according to the equalized valua-

Magee *v.* Cutler.

tion of said county. That the amount of said bonds is about
$750,000, and that such bonds are issued in due form of
law. That eleven towns of said county would pay a less
sum respectively by such equalization than said towns would
pay in accordance with said resolutions of said board, and
such sum in the aggregate would amount to about $140,000,
which would be chargeable to the remaining six towns of said
county, in addition to what such towns would be liable to
pay under said resolutions and the action of said towns; and
that by such equalization the said town of Groveland, if
charged with the amount of said twenty-nine bonds, would
pay about $10,000 more than such amount. The com-
plaint further states, that notwithstanding the draft so made
for the said town of Groveland, the said supervisors are pro-
ceeding to impose such additional sum of $10,000 on said
town, in addition to the sum of $23,350, for the bonds issued
to the supervisor of said town and sold by him, and have
already, by a vote of said board, imposed and assessed about
$200,000 of such $750,000 on the taxable property of said
county; and that in such sum of $200,000 is included the
proportional part of the amount due on the bonds so issued
to the said town of Groveland.

The complaint further states, that unless this court shall
grant to the plaintiffs, and others so interested, equitable re-
lief, great and irreparable injury will be occasioned, among
others, for the following reasons: First, that if the plain-
tiffs delay action till the tax rolls are completed and warrants
issued for their collection, their attempt to contest the legal-
ity of such assessment would delay the collection of a large
amount of taxes, the legality of which is unquestioned, to
the great public detriment. Second, that it might be impos-
sible to prevent the collection of such taxes when so illegally
imposed, and in such case the enforcement thereof would
lead to a multiplicity of suits. Third, if such illegal tax was
collected by being imposed on the taxable property of the
county, then it would be difficult to follow and distinguish

it after it had been intermingled with other funds.  Fourth, that the proceedings before such board of supervisors, as well as the proceedings of such town meetings, appear fair and valid upon their face, and that extrinsic facts are necessary to be proved, in order to establish the invalidity of such bonds so issued· for the town of Groveland, which can not be brought before the court by the writ of certiorari, viz. the proceedings of the board of enrollment aforesaid.  Fifth, that unless the court grants such equitable relief, such illegal taxes, by means of the proceedings had and to be had by and before such board of supervisors, will become a lien upon the land of the said plaintiffs and other parties, as aforesaid, and a cloud upon the title thereof.

The complaint prays judgment that such board of supervisors be perpetually enjoined from assessing, imposing or levying upon the taxable property of the town of Groveland, or upon the taxable property of the county of Livingston, the amount of the said bonds so issued to or for said towns, or any part thereof, or from enforcing or attempting to enforce the collection of such bonds or the amount thereof, upon the taxable property of the said town of Groveland or the said county of Livingston.

The complaint was duly verified, and several affidavits of the plaintiffs annexed ; and an injunction was duly granted thereupon by one of the justices of this court, and was served. The defendants moved, at a special term, to dissolve such injunction on said complaint and affidavits, and said motion was ordered to stand over and be heard at a general term. The defendants controverted several of the allegations of the complaint, and stated and alleged that the twenty-nine bonds issued to the supervisor of Groveland were all used, or the proceeds thereof, to procure recruits or volunteers to fill the quota of said town; that the said quota was all filled by volunteers procured by the supervisor of said town, to whom the state and government bounty was also paid ; that such volunteers were received by the government and were

accepted and mustered into the military service in full of the quota of said town; and it alleged that none of the persons drafted for said town were ever accepted or mustered into the service as they were required to be, by the proper officer. And the plaintiffs showed, also, by the affidavits and the instructions of the provost marshal and other officers of the general government, that volunteers were customarily received in lieu of drafted men up to the time when the men are actually mustered into the service; and such were the general rule and instructions governing the subject, from the proper officers and authorities of the general government.

The affidavits also showed that on the 30th of November, 1864, at the annual meeting of the board of supervisors of said county, a resolution was duly passed by said board, directing that there be assessed and levied and collected upon the taxable property of the said county the sum of ——— dollars, to be applied by the county treasurer to the payment of the Livingston county bonds falling due in February, 1865, issued for the payment of bounties to volunteers to fill the quota of Livingston county under the call of the president for 500,000 men, of July 18, 1864; and that the same be assessed, levied and collected as other county taxes are assessed, levied and collected.

The defendants also read an affidavit of the clerk of the board of supervisors, stating that no notice of the proceedings of any town meeting of any of the towns of said county, in relation to the payment of town bounties to volunteers under the call for 500,000 men aforesaid, was ever presented to said clerk of said board; nor had copies of any of the proceedings of said town meetings ever been presented to or filed with him as such clerk, or been presented to said board, or any notice thereof given at any of its meetings since July 18, 1864, or served upon said board.

*A. J. Abbott* and *T. R. Strong,* for the defendants.

*G. F. Danforth,* for the plaintiffs.

*By the Court*, E. DARWIN SMITH, J. This is an action in equity. The complaint invokes the equitable powers of this court to restrain by a perpetual injunction the imposition of a tax which will be a lien upon the plaintiffs' lands and a cloud upon their title thereto. An injunction is the peculiar process of a court of equity, and it can only issue where a party to an action is entitled to equitable relief. Section 219 of the code provides that "when it shall appear by the complaint that the plaintiff is entitled to the relief demanded, and such relief or any part thereof consists in restraining the commission or continuance of some act, the commission or continuance of which during the litigation would produce injury to the plaintiff, or when during the litigation it shall appear that the defendant is doing, or threatens, or is about to do or procure some act to be done in violation of the plaintiff's rights respecting the subject of the action, and tending to render the judgment ineffectual, a temporary injunction may be granted to stay such act." The first inquiry that meets us in the examination of the case is whether the plaintiffs make out a case where they would be entitled to equitable relief; for the relief intended by this section of the code, means *such* relief, such as pertains to a court of equity, and is exclusively given by such courts. The plaintiffs do not question the validity of the resolutions passed by the board of supervisors on the 3d of August, and on the 2d day of September, set out in their complaint; nor do they deny the legality of the proceedings of the special town meeting held in the town of Groveland on the 23d of September, also mentioned in the complaint; and if they did, it is very clear that we can not in this suit review those proceedings. It is well settled, and has been ever since the decision in the court for the correction of errors in the case of *The Mayor &c. of Brooklyn* v. *Meserole*, (26 *Wend.* 132,) that a court of equity has no such jurisdiction. Chancellor Kent, in *Mogers* v. *Smedly*, (6 *John. Ch. R.* 31,) said, "I

can not find by any statute or procedent or practice, that it belongs to the jurisdiction of chancery, as a court of equity, to review or control the determination of the supervisors, but that the review and correction of all errors, mistakes and abuses in the exercise of the powers of subordinate public jurisdictions, and in the official acts of public officers, belongs to the supreme court, and has always been a matter of legal and not of equitable cognizance." The same doctrine has been repeatedly asserted, since, in *Wiggin* v. *The Mayor of New York*, (9 *Paige*, 16, 388,) *Heywood* v. *The City of Buffalo*, (4 *Kernan*, 534,) and in *Susquehannah Bank* v. *The Supervisors of Broome Co.* (25 *N. Y. Rep.* 314.)

But the case of *Heywood* v. *The City of Buffalo*, which was a very carefully considered case, and the last in the court of appeals where the question was distinctly raised, makes three exceptions to the general rule as follows : "First, where the proceedings in the subordinate tribunal will necessarily lead to a multiplicity of actions. Second, where they lead to the commission of irreparable injury to the freehold. Third, where the claim of the adverse party to the land is valid upon the face of the instrument, or the proceedings sought to be set aside, and extrinsic facts are necessary to be proved to establish the invalidity or illegality." The plaintiffs in this complaint and in the argument of their counsel present two of the above mentioned grounds of jurisdiction, the first and the third. Actions to prevent litigation and a multiplicity of suits are not ordinarily entertained till the plaintiff has established his right at law, and is nevertheless in danger of further suits by parties who controvert such right, or where the parties who controvert his right at law are so numerous as to render an issue under the directions of the court indispensable to embrace all the parties concerned, and to save a multiplicity of suits. (*Eldridge* v. *Hill*, 2 *John. Ch.* 281.)

In some cases the courts of equity having acquired jurisdiction upon other grounds, have retained it for the purpose of relief, to prevent a multiplicity of suits. (1 *Story Eq.* 64, *and*

*Fonblanque's Eq. B.* 1, *chapter* 1.)   The plaintiffs here were not subject to any peril of litigation from adverse parties. No person has sued them, or threatened to do so, in respect to the tax in question ; and if the tax were levied and collected, a single action commenced by either of them would settle the controversy, so far as we can see.

This action, therefore, can not be sustained upon the ground that it will prevent a multiplicity of suits. The plaintiffs have no grievance to complain of on this head, and none which calls for any preventive remedy from a court of equity. If the proceedings to levy and impose the taxes in question are illegal and invalid upon the face of the record, a single action at the suit of the people upon common law certiorari, after the proceedings of the supervisors are completed and consummated, to lay and levy such tax, would undoubtedly bring up the whole proceedings for review, when they could be reversed and set aside or quashed, and the plaintiffs could also easily defend themselves in a suit at law against them, and they would constitute no apparent cloud upon their title.

The other ground for the equitable interference of this court suggested is, that the proceedings to impose such tax are, or appear to be, fair and valid upon their face, and that extrinsic facts are necessary to be proved in order to establish the invalidity of the bonds issued to the supervisor of Groveland, which can not be brought before the court on writ of *certiorari,* to wit, the proceedings of the board of enrollment set out and detailed in the same complaint. It is true that a common law certiorari only reviews the record; but it is quite a question in many cases, what constitutes the record. There has been much contrariety of opinion on the question, what is to be deemed embraced within the record, and returned as part of it in these cases.

I apprehend that as the certiorari goes to review a judicial act—a consummated judicial decision—a proper return to such writ will bring up as part of the record, whatever entered

Magee *v.* Cutler.

into, or was necessarily passed upon, in the decision of the question sought to be reviewed. *In Mullins* v. *The People*, (24 *N. Y. Rep.* 399,) this question was discussed by Judge Selden, and the court held that in the case of a summary conviction the evidence must be returned, (*See also the People* v. *Goodwin*, 1 *Seld.* 568.) But assuming that the plaintiffs are right upon this question, and that upon certiorari the proceedings upon the enrollment can not be brought before the court, I will consider the question whether these proceedings as they appear before us, present any matter for equitable relief to the plaintiffs within the exceptions to the rule, as stated by Judge Johnson in *Haywood* v. *The City of Buffalo*, (*supra.*)

Assuming that the resolutions of the board of supervisors of the 3d of August and 3d of September, and the proceedings of the special town meeting of Groveland, were valid, and I think there can be no doubt of their validity, then the supervisor of Groveland was duly empowered to receive from the county treasurer the bonds of the county, such bonds, or the proceeds thereof, to be used in paying bounties to volunteers to fill the quota of said town, unless the intervention of the draft on the 16th of September rendered such use or appropriation of said bonds, or the proceeds thereof, unlawful, or, in other words, had filled the quota of said town so that no volunteers were thereafter legally called for, or could be required from said town. This is the argument and claim of the plaintiffs and their counsel.

The 22d section of the act of 1864, (*ch.* 8, *p.* 25 *of Session Laws,*) expressly authorized the board of supervisors, at any meeting of said board duly called, to adopt resolutions to provide for raising money upon the credit of their respective counties for the use of said county, or upon the credit of any city or town thereof for the sole use of said city or town ; or to impose a tax upon the taxable property of their respective counties, for the use of said county, or upon any town or city *for the purpose of paying* volunteers into the military or

naval service of the United States during the war, &c. The money to be raised under this act was to be expended in paying bounties to volunteers. It could not be lawfully used for any other purpose, except as provided in said act, in furnishing temporary relief to the families of volunteers, and paying the incidental expenses of such volunteering and of raising such moneys.

The supervisor of the town of Groveland, in his affidavit, states that soon after the special town meeting held in that town, he commenced recruiting for volunteers to fill the quota of said town; that he recruited twenty-eight men, and one was credited said town from an excess on the former quota; that he received the bonds of the county from the treasurer, pursuant to the resolutions of the board of the 3d of August and 2d of September; that he paid all the proceeds of such bonds, $23,350, in filling the quota of said town, and that no part or portion of said bonds, or the proceeds thereof, was used for any other purpose, except in the payment of, or in procuring money for the payment of volunteers to fill said quota. That the twenty-eight men recruited by him were duly mustered into the service of the United States as soldiers and volunteers, and each and every one of them was received and credited upon the quota of the said town of Groveland as a volunteer, and received the bounty paid by the United States government to volunteers, as he is informed and believes, and that no one of said twenty-eight men was mustered as a substitute for any person.

I do not see why this is not a complete compliance with the statute, and the resolutions of the board of supervisors and of the town meeting of Groveland. The supervisor has, according to his statement, faithfully performed his duty, and faithfully disbursed the public money according to the express provisions of the law; and I can not see why the bonds he received and used for this purpose, in the manner stated by him, were not properly received, lawfully negotiated, and the proceeds honestly applied. But it is said that

while this is apparently so, yet that these moneys were really expended to procure substitutes for the men drafted on the 16th of September to fill the quota of said town, and that after .such draft volunteers could not be lawfully received in discharge of such drafted men, except as substitutes, and that the money received from these bonds could not be lawfully paid for substitutes. The supervisor .says that not one of the twenty-eight men recruited by him was received or mustered as a substitute for any other person; .that no portion of the bonds or money received from them was used to procure substitutes. While this is or may be so, it is impossible not to see that the volunteers recruited by him did serve the purpose, as a whole, of supplying the place of the twenty-eight drafted men from said town, and saved any of such drafted men from the necessity of going into the military service of the country. The supervisor means, undoubtedly, that not one of the twenty-eight men was recruited, received or mustered into service specifically for any other particular man, or for any one individual of the drafted men. But I have no doubt that the spirit and intent of the statute, and of the resolutions of the board of supervisors and of the town meetings of Groveland, was entirely fulfilled and complied with in the manner in which the supervisor procured volunteers to fill the quota of said town. Call the twenty-eight recruits volunteers or substitutes for drafted men at large, and the law is not violated, and the resolutions aforesaid are fully carried out and executed according to their true intent and spirit. The town of Groveland has had its quota filled without taking a single drafted man from the town. This was the object which the town really had in view in its resolution, and desired to secure. This was what the resolution of the board of supervisors and the act of the legislature in question were passed to accomplish. The purpose of the legislature and the supervisors, and of the inhabitants of Groveland, so far as pertains to the action of their town, was to secure for the military service of the country soldiers who

should freely enlist and voluntarily enter the army of the United States, instead of being compelled to resort to a compulsory draft. This act and all the acts referred to were passed, and all the resolutions and acts in the execution of said statute were in furtherance of this policy, and of these purposes. I can not see why a man who freely enlists in the place of another, and becomes his substitute of his own free will and accord, is not a volunteer within the spirit and intent of the act of the legislature, as much as any other man who enlists under any other. circumstances. The draft is used by the government because men are required, but it obviously prefers volunteers to drafted men, and the draft serves to stimulate volunteering.

I can not see why this is not entirely proper. A substitute, I think, is a volunteer according to the spirit and intent of the statute, and I can not see how it can be held otherwise. The town of Groveland and the county has had the benefit of this doctrine in the practice of the government, and has no reason to complain of any injustice in this particular; and I think the law has in no respect been violated in the manner in which the town was relieved from the duty to send twenty-eight of its citizens against their will into the military service of the country. If I am right in this view, the extrinsic fact arising out of this enrollment and the questions connected with it present no basis for the equitable interference of this court, or basis of jurisdiction in this action, within the rule stated in *Haywood* v. *The City of Buffalo.*

But the plaintiffs present another ground for equitable relief in this suit. They claim that the proceedings of the town of Groveland, and of the other towns of the county of Livingston, under the resolutions of the 3d of August and 2d of September, create the right on the part of the several towns to be taxed only for the amount of the bonds issued to the supervisors of the respective towns, and allege that the board of supervisors are proceeding to treat all such bonds as

a county charge, and to impose and levy upon the taxable property of the county at large a tax sufficient to pay the same as they mature, and have already, by a vote of the board, imposed and assessed about the sum of $200,000 on the taxable property of said county, which will impose an increased tax on the said town of Groveland of about $16,000, over and above the $23,350 for which the town would be liable if the bonds issued to the supervisor of said town should be held valid and separately chargeable.

It is claimed that these facts or, some of them, are essential to present the questions upon a certiorari, and would be *dehors* the record. Upon a certiorari now directed to the supervisors, they would be required to return the assessment roll if it is complete, and the warrant annexed thereto, together with the resolutions of the 3d of August, the 2d of September, and of the 30th of November; and all other resolutions and proceedings of said board, showing jurisdiction to impose said tax upon the county at large. But I have some doubt whether a writ of certiorari to the board of supervisors would bring up any of the proceedings of the towns respectively, had under the resolutions of the 3d of August and 2d of September. These proceedings would not appear on the face of the record of the board of supervisors, as in their determination to impose a tax upon the county at large, for all the bonds issued under these resolutions, the proceedings and actions of the respective towns of said county under said resolutions are practically ignored. In this view I do not see how we can avoid passing upon the question whether the board of supervisors are empowered or not to impose a tax upon the county at large for said bonds, as a county charge.

Section 22 of the act of 1864, empowers the board of supervisors of each county to provide for raising money to pay bounties to volunteers in two ways: One upon the credit of the county, and the other upon the credit of the town. They could raise money by borrowing on the credit of the county or of the respective towns, or by levying or imposing a tax

·upon the taxable property of their respective counties, or upon the towns or cities of their counties for such purpose. The board of supervisors were entrusted with the whole subject of declaring the manner and mode of raising such moneys in their discretion.

The resolution of the board of supervisors, of the 3d of August, provides for the issue of county bonds to each supervisor who might call for the same, to pay a bounty of $300 to each recruit that should be mustered into the service of the United States to the credit of their respective towns, for the term of three years, and not exceeding $200 to each recruit mustered for one year, and $25 premium or expense money for each recruit furnished for one year. This I think is a provision to issue these bonds upon the credit of the county, and the bonds issued under it are a county charge. The money is to be paid to recruits credited to the respective towns, but it is not borrowed or advanced on the credit of the towns. The money paid is raised on these bonds for the county; when raised it was county money. The respective towns can not, I think, be lawfully charged for such money, or taxed for it individually. The resolution did not provide for the creation of town debts, or for the issue of town bonds.

The supervisors, in form and in legal effect, provided in and by such resolutions to raise money upon the credit of their county for the use of said county. They did not provide under the act "to raise money upon the credit of the towns of this county or of any towns thereof." They propose to raise money and allow the respective towns to draw an equal amount thereof *pro rata* to pay bounties to volunteers who should be recruited in the respective towns, or for such towns, and be received on its quota in lieu of drafted men as volunteers into the military service of the country. There are not in this resolution any apt or appopriate terms, or words, or phraseology adapted to create a town debt or raise money on the credit of the respective towns of said county. I entirely concur, on this point, with the views expressed in

Magee *v.* Cutler.

the opinion of my brother J. C. Smith, in his opinion upon the application to dissolve the injunction issued in the case of the town of Ossian, arising under the act and resolution in this same county,(a) that the bonds authorized and issued under the resolution in question, are county bonds issued on the credit of the county solely and are, as such, binding on the whole county.

(a) The case referred to is the following:

JAMES FAULKNER and others *vs.* CHAUNCEY METCALF, Treasurer of the county of Livingston.

MOTION to vacate an injunction order, granted by the county judge of Livingston, restraining the defendant from issuing to the supervisor of the town of Ossian, in that county, certain bonds of said county for the purpose of paying bounties to volunteers under the late call of the president of the United States for 500,000 men.

The papers presented on the motion, consisting of the complaint which is verified, and affidavits on each side, establish the following facts: The board of supervisors of Livingston county, at a special meeting held on the 3d day of August, 1864, adopted the following resolution:

"Whereas the president of the United States did, on the 18th of July, 1864, call for 500,000 volunteers; therefore, resolved, that the treasurer of the county of Livingston be authorized to issue the bonds of said county, bearing annual interest, to each supervisor who may call for the same, and borrow money on such bonds for such supervisors as may call for money, to pay a bounty, not exceeding $300, to each recruit that shall be mustered into the service of the United States, to the credit of their respective towns for the term of three years; and not exceeding $200 to each recruit mustered for one year under said call; and $25 premium, or expense money, for each recruit furnished for one or three years."

At another special meeting, held on the 2d of September, 1864, the said board adopted the following resolution:

"Resolved, That each town in the county of Livingston be authorized to increase its bounty to a sum not sxceeding $1000, and that the treasurer of this county be authorized to issue county bonds as each supervisor may call for them, subject to the same regulations as prescribed by the resolution of this board passed August 3, 1864."

At a special meeting of the electors of the town of Ossian, held on the 22d of August, 1864, resolutions were passed by a majority of the electors present and voting, authorizing said town (1.) to pay a bounty of $300 for recruits for one year, in addition to the bounties therefor authorized by the board of supervisors, the money to be borrowed on town bonds;

The resolution of the 3d of September does not militate against this view, but to my mind strengthens it. That resolution allowed the town to increase the bounty to $1000. This treated the towns all alike. It left them at liberty to pay bounties to a common amount of $1000 and no more. If the supervisors had contemplated the creation of town

(2.) to pay all bounties to any person furnishing an accepted substitute credited on the quota of the town; (3.) to pay said bounties to each drafted man entering the service; and (4.) authorizing the supervisor to use $100 extra bounty, if necessary, to fill the quota of the town; the money to be raised in the same manner as the money to pay the $300 town bounty.

At another special town meeting of the electors of said town, held on the 14th of September, 1864, it was voted by a majority of 27 votes out of 133, that no money should be raised upon the credit of the town for the purposes aforesaid.

At a subsequent special meeting of the electors of said town, held on the 26th of September, 1864, the following resolution was adopted by a vote of 113 to 75:

" Resolved, That the town of Ossian increase its bounty for volunteers to fill its quota of thirty under the call of July 18, 1864, for 500,000 men, not exceeding $900 for each recruit; and that the same sum paid to recruits be paid to persons volunteering as substitutes, or to the person procuring the same, provided that such substitute is counted on the quota of the town, and that the bonds for the same be issued payable in three yearly installments, commencing from the first of February next, first installment payable on the first of February next."

JAMES C. SMITH, J.   The evidence before me is somewhat conflicting in respect to what took place at the meeting of the 26th of September, but I consider the fact satisfactorily established, that the sense of the meeting was fairly and legally taken and declared upon the question whether the last resolution above transcribed should be adopted, and that the result of the vote was as above stated.

The plaintiffs allege in their complaint that they are taxpayers in the town of Ossian; that the defendant is the treasurer of the county of Livingston; and that the number of men required to be furnished by the town of Ossian under the call for volunteers is thirty.

They also allege in the complaint — and this is the *gist* of their action — that the proceedings of the said several special town meetings are illegal and invalid, and do not authorize the county treasurer to issue the bonds of the county to the supervisor of said town; but that, nevertheless, said supervisor is about to call upon the treasurer to deliver to him the bonds of said

debts, why restrain the towns in the amount they should respectively pay for the bounties? This resolution implies upon its face that the towns are to draw from a common fund, the funds of the county, to pay the bounties, and therefore, they are to be treated equally, and each limited to a given sum for the amount, so to be drawn or received from the treasurer.

county to the amount of $900 for each man necessary to be furnished by said town, and the supervisor intends, when the bonds are delivered to him, to raise money thereon to pay bounties to volunteers or drafted men applying upon the quota of said town, "making [such is the language of the complaint] the amount so paid a tax upon the property of said town."

The injunction restrains the defendant from issuing to the supervisor of Ossian bonds of the county to a greater amount than nine thousand seven hundred and fifty dollars; thus recognizing the right of the treasurer to issue to such supervisor, and of the latter to receive and use, in payment of bounties, county bonds to the amount of three hundred and twenty-five dollars for each man of the quota of said town, in pursuance of the resolution of the board of supervisors, adopted in August, but denying the right to issue or receive bonds for the payment of the increased bounties provided for by the resolution passed by the board in September.

I have examined the case thus presented, with the care due to the importance of the questions and interests involved in it, and I am of opinion that it does not justify the interference of a court of equity if that injunction should be dissolved. I will state briefly the reasons which lead me to this conclusion.

The plaintiffs, as taxpayers of the town of Ossian, ask the court to prevent the issuing of the bonds in question to the supervisor of that town, for the reason that if they shall be thus issued, and issued as proposed by such supervisor, a debt, illegal in reality but apparently legal, will thereby be created against said town, which the taxpayers thereof will be liable to pay.

The groundwork of this claim, as has been already stated, is that the proceedings of the electors of said town at the several special town meetings are illegal and invalid. In my judgment, the proceedings of those meetings are not material to the validity of the bonds, or the right of the defendant to issue them, or of the supervisor of Ossian to receive them.

Assuming, for the purpose of the argument, the invalidity of the action of the several town meetings, it is difficult to perceive how the issuing of the county bonds to the supervisor of the town, in pursuance of the resolution of the board of supervisors, can create any actual or apparent liability against the town. The resolutions of the board of supervisors, authorizing the treasurer to issue said bonds, were adopted in pursuance of the provisions of section 22, chapter 8 of the laws of 1864, (*Sess. Laws*, 1864, *p.* 24.) It will be .

I am very clear in the opinion that no town debt was created under their resolution for any of the bonds issued to the respective supervisors of said county. The bonds being issued under the authority of the board· of supervisors upon the credit of the county, are valid bonds of the county, and it is the right and duty of the board of supervisors of that county

seen by referring to that section that it authorizes the boards of supervisors of the several counties in this state to adopt resolutions to provide for raising money for the purpose of paying bounties to volunteers, and for certain other purposes therein specified, either (1.) by loan upon the credit or tax upon the property of their respective *counties,* or (2.) by a loan upon the credit or tax upon the property of any *city or town* thereof. These two modes of procedure are separate and distinct each from the other. The board may raise money in the first mode by their own independent action; in the second mode their action is insufficient, without the concurrent vote of the town or city whose credit is pledged or property taxed.

Again, money raised in the first mode can only be devoted to the *use of the county;* money raised in the second mode must be appropriated to the sole use of the city or town upon whose credit or property it is raised. The board of supervisors of Livingston expressly provided, by each of the resolutions in question, that the moneys thereby voted should be raised by the issuing of *county bonds,* that is, upon the credit of the county. No other mode was provided. They did not propose a tax upon the several towns, or the issuing of town bonds. The resolution increasing the bounty to one thousand dollars, and providing for raising it upon the credit of the county, obviated all necessity for action by any town for the purpose of raising money upon its own credit, unless it proposed to pay more than one thousand dollars bounty to each man.

The conclusion is unavoidable, that as the board had power independently of town action, to fix the amount of bounties for the whole quota of the county, and to provide for raising the entire sum on the credit of the county, and as they fully and properly exercised that power by adopting the resolutions in question, it is not only the right but the duty of the treasurer to issue and deliver to the supervisor of Ossian the amount of bonds in controversy, as directed by the resolutions. No charge will be created thereby against the town, and the plaintiffs, as taxpayers of that town, have no cause of complaint.

In coming to this conclusion I have not overlooked the provisions of the resolution of September 2, authorizing each town in the county " to increase its bounty to a sum not exceeding $1000;" nor have I failed to give attention to the opinion of .the learned judge who granted the injunction, to the effect that this clause " contemplated the action provided by the statute, and

---
Magee *v.* Cutler.
---

to provide accordingly for their payment as legitimate public debts of the county. It is urged that as the towns are each sub-military districts from which respectively the quota recruits was called, or in or from which the draft was to be made, the money raised by these bonds could not legally be raised from the county at large, because the money can not

requires a vote of the town that the sum to be raised shall be a charge upon the property of the town." The judge expressed serious doubt as to the correctness of this view, and evidently adopted it with reluctance.

Looking at the language of the two resolutions—and by their language alone can their meaning be judicially ascertained—I can not doubt that the only intention legally perceptible on the face of the resolutions is that which I have already stated, to wit, that the entire amount of bounty money, not exceeding one thousand dollars a man, should be raised on the credit of the county, and that it was not contemplated that the towns should take any action, except to indicate what sum, not exceeding that amount, they would respectively require to fill their quota. Even that action was not essential to the validity of the bonds.; but if it were, the resolution adopted by the electors of Ossian, at the special town meeting on the 26th of September, was unquestionably sufficient for that purpose.

It is not material, in this view of the case, to consider whether the resolution last referred to did or did not amount to a vote that the money to pay the increased bounties should be raised upon the credit or by a tax upon the property of the town. If it be conceded, as claimed by the plaintiffs, that the electors merely voted that the bounty for volunteers credited to that town should not exceed nine hundred dollars, and did not vote to make it a town charge, that fact is a very clear indication that they understood the last resolution of the board to provide for raising the whole amount of bounty money on the credit of the county. That such was their understanding of the resolution seems to be further evinced by the fact that, after its adoption by the board, the electors voted that no bounty money should be raised on the credit of the town, although before its adoption they had voted to raise a bounty on the credit of the town, in addition to the county bounty provided for by the resolution of the 3d of August. It is also manifest, in this view of the case, that the proceedings of the special town meeting of September 26 are not open to the objection made by the plaintiffs, that the power of the electors over the subject matter of those proceedings had been exhausted at a previous meeting. They then, for the first time, took the action contemplated by the resolution of the board of September 2.

The views above expressed, dispose of the whole case. It may be well, however, to notice a point raised by the allegation in the complaint, that the supervisor of Ossian intends, with the money to be raised on the bonds, " to

be claimed or termed raised for "the use of the county," since no volunteers or recruits are called from the county as such. The legislature has settled this question.

It treats in the act the counties as they are, distinct political organizations of the state, and authorizes the supervisors thereof to provide to pay bounties for volunteers from the limits of such counties. It has thus declared, in legal effect, that money raised by any county under the authority of the board of supervisors of such county to pay bounties to volunteers received and mustered into the service of the government from any town of such county, is money raised and applied to the use of such county.

If these views are correct, no ground for the interference of this court arises from the fact that the board of supervisors propose to tax the county at large for these bonds issued under their authority. But this action can not be sustained, for other reasons. The plaintiffs have no common interest in the subject in controversy, to entitle them to join in the action. They are freeholders and taxpayers of Groveland. A tax would be a lien upon their respective lands, but not upon any common property owned by them. Parties so situated can not join in a suit in equity. (*Bouton* v. *The City of Brooklyn*, 15 *Barb*. 375.) But the plaintiffs, if otherwise entitled to maintain the action, could have no effectual relief

pay bounties to volunteers or *drafted* men applying on the quota of said town." It is enough to say that the bonds can not rightfully be used, except for the purpose authorized by the statute and the resolutions of the board; but for the accomplishment of that purpose the treasurer must be allowed to issue them in pursuance of the terms of the resolution. The court can not restrain the issuing of the bonds in the mode prescribed by the proper authorities upon a mere apprehension that the public officer who is designated to receive them will misapply their avails.

As the case is thus decided on its merits, it is unnecessary to consider the various questions of practice and pleading that were discussed on the argument.

The injunction is dissolved with ten dollars costs of the motion.

[ONTARIO SPECIAL TERM, October 11, 1864.]

in this suit. The action is against the individual supervisors, not against the board of supervisors. When a county is to be sued, the action must be against the board of supervisors and not against the individual members. (10 *Wend.* 383. 19 *id.* 102. 5 *Denio,* 517. 9 *How.* 316.)

The plaintiffs ask a perpetual injunction. Such injunction would only stay the defendants, not their successors in the next board of supervisors, or bind the county. The injunction I think should be dissolved with costs.